# United States Court of Appeals

## For the First Circuit

No. 02-2201

UNITED STATES,

Appellee,

v.

JOHN J. CONNOLLY, JR.,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lipez, Circuit Judge,
Porfilio, Senior Circuit Judge,[*]
Howard, Circuit Judge.

Andrew Nathanson, with whom Tracy A. Miner, John J. Tangney, Jr., and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C. were on brief, for appellant.

William J. Nardini, with whom John H. Durham and Michael J. Sullivan, United States Attorney, were on brief, for appellee.

August 14, 2003

---

[*] Of the United States Court of Appeals for the Tenth Circuit, sitting by designation.

**LIPEZ**, <u>**Circuit Judge**</u>.  At the conclusion of a three week trial, a federal jury found former Federal Bureau of Investigation ("FBI") agent John J. Connolly, Jr., guilty of one count of racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), two counts of obstruction of justice, 18 U.S.C. § 1503, and one count of making false statements, 18 U.S.C. § 1001.  The district court subsequently imposed a sentence of 121 months of imprisonment, followed by a two-year period of supervised release.  Connolly now appeals his RICO conviction, arguing that he is entitled to a judgment of acquittal on the RICO charge because the government failed to prove two critical elements of its RICO charge — participation in an "enterprise," and a "pattern of racketeering activity."  <u>See</u> <u>id.</u> § 1961(4), (5) (defining "enterprise" and "pattern of racketeering activity").[1]

Connolly also appeals his sentence, arguing that the district court erred in its calculation of the applicable offense level pursuant to sections 2E1.1, 2J1.2, and 2X3.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). Finally, Connolly argues that the district court erred when it denied his request to convene a post-verdict evidentiary hearing to inquire into the propriety of alleged note-taking by jurors.  He

---

[1] Connolly does not appeal his convictions for obstruction of justice and making a false statement.

asks that we remand the case to the district court for an inquiry into possible juror misconduct.

Finding no reason to disturb Connolly's conviction or sentence or to remand to the district court, we affirm.

**I.**

We provide some general background facts here, saving our more detailed discussion of the evidence for our assessment in Part II of Connolly's claims of evidentiary insufficiency. Connolly joined the FBI in 1968; from 1973 until 1990 he served as an agent in the Bureau's Boston office. During his tenure, he was responsible for handling several high-ranking, confidential informants with connections to two criminal syndicates — the Winter Hill Gang, and the New England branch of La Cosa Nostra. According to the government, the Winter Hill Gang is a "clandestine criminal organization engaged in multiple crimes, including murder, bribery, extortion, loan sharking, and illegal gambling in the greater Boston, Massachusetts area." La Casa Nostra — a considerably larger, better known, and more established criminal organization — similarly engages in illegal activities in and around Boston. Despite the fact that the Winter Hill Gang and La Cosa Nostra were often rivals, members of the two groups frequently cooperated in criminal undertakings.

Two of the informants for whom Connolly was responsible, James Bulger and Stephen Flemmi, were members of the Winter Hill

Gang. Bulger and Flemmi reported on the activities of both the Gang and La Cosa Nostra for over a decade. Shortly after Connolly retired from the FBI in 1990, however, Bulger and Flemmi were "closed" as FBI informants — i.e., the FBI no longer desired their services.

After Bulger and Flemmi ceased to serve as informants, their involvement with the Gang's criminal activities nonetheless continued. For example, at some point in the early 1990s, Flemmi, working with the "boss" of La Cosa Nostra's Boston family, Frank Salemme, ran an illegal "numbers" operation in the Boston area. On January 10, 1995, a federal grand jury indicted Bulger, Flemmi, Salemme, and several other persons for multiple counts of illegal gambling, extortion, assault, bribery, obstruction of justice, loansharking, and RICO violations. See United States v. Salemme, No. 94-CR-10287-MLW-2 (D. Mass. Jan. 10, 1995) (indictment). Flemmi was quickly arrested and taken into custody. Bulger and Salemme, however, forewarned of the pending indictment, disappeared a few days before its issuance. The authorities apprehended Salemme eight months later. Bulger remains at large.

The instant criminal proceeding began in December 1999, when another federal grand jury indicted Flemmi and Connolly on charges of racketeering, obstruction of justice, and conspiracy.[2]

---

[2] The indictment also named Bulger as a defendant on one count. That count was ultimately dismissed on the government's motion after the issuance of the superceding indictment (which did

A superceding indictment was filed in October 2000 with additional charges of obstruction of justice and making a false statement. According to the superceding indictment, Connolly had led a double-life for over two decades. While serving as an FBI agent, Connolly had been intimately involved in the criminal activities of the Winter Hill Gang and its members, receiving and making bribes from and on behalf of members of the Gang. Even after his retirement from the Bureau, Connolly allegedly continued to exploit his connections within the Bureau to become privy to confidential information that he would then pass along to members of the Winter Hill Gang.

Specifically, the superceding indictment included nine counts, which we summarize as follows:

> Counts 1 & 2 – RICO and Conspiracy to Violate RICO, alleging that Connolly had, through a pattern of racketeering activity, participated in the affairs of an association-in-fact enterprise whose members included Bulger, Flemmi, himself, and unidentified others. The purpose of the enterprise was to protect Bulger, Flemmi, and their associates (including Salemme and members of the Winter Hill Gang) from arrest and prosecution, and to facilitate their criminal activities. The two counts detail fourteen different "racketeering acts," including allegations of bribery, extortion, and obstruction of justice.
>
> Count 3 – Conspiracy to Obstruct Justice, alleging that Connolly and Flemmi, together with others, had conspired to obstruct justice

---

not name Bulger as a defendant).

in the prosecution of Bulger, Flemmi, and Salemme in United States v. Salemme.

Count 4 – Obstruction of Justice, alleging that Connolly had informed Salemme of the pending indictment in United States v. Salemme.

Count 5 – Obstruction of Justice, alleging that Flemmi had also provided Salemme with news of the pending indictment.

Count 6 – Obstruction of Justice, alleging that Connolly had caused an anonymous letter to be sent to Judge Mark Wolf who was presiding over United States v. Salemme. The letter purported to come from three unnamed Boston Police Officers and credited certain claims made by the defense.

Counts 7 & 8 — Obstruction of Justice, alleging that Connolly had persuaded Flemmi to give false testimony in United States v. Salemme. Specifically, Connolly persuaded Flemmi to testify that another FBI agent — and not Connolly — had alerted him and Bulger to the pending indictment.

Count 9 – False Statement, alleging that Connolly had lied to an FBI agent when he told the agent that he had not been in contact with the defense team in United States v. Salemme.

Flemmi ultimately pleaded guilty to Counts 3 and 5 (the only two counts in which he was named) and was sentenced to 41 months of imprisonment.

In May 2002, the trial against Connolly began on Counts 1, 4, 6, 7, and 9.[3] At the close of the government's case and at the close of all of the evidence, Connolly moved for a judgment of

_____

[3] The remaining counts against Connolly were severed prior to trial and ultimately dismissed on the government's motion.

-6-

acquittal pursuant to Fed. R. Crim. P. 29.  The court denied the motions.  The jury returned guilty verdicts against Connolly on four of the five counts at issue — Counts 1, 6, 7 and 9 — and acquitted on Count 4.  Connolly renewed his Rule 29 motion after the verdict, and the court once again denied it.

On September 16, 2002, the district court sentenced Connolly to a term of incarceration of 121 months followed by a two-year period of supervised release.  The district court denied Connolly's request for release on bail pending appeal, and we denied a similar, subsequent application.  We now address Connolly's arguments of error by the trial court.

## II.

Connolly claims that he is entitled to a judgment of acquittal on the RICO count because the government failed to present sufficient evidence to prove beyond a reasonable doubt two essential elements of the RICO charge:  (1) Connolly's participation in an "enterprise," and (2) a "pattern of racketeering activity," as defined by statute and applicable case law.  See 18 U.S.C. § 1961(4), (5).

In evaluating a claim of insufficiency of the evidence, we review the record de novo, and "[w]e will affirm the conviction if, 'after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that

the prosecution successfully proved the essential elements of the crime.'"  United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003) (quoting United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)).  We "need not believe that no verdict other than a guilty verdict could sensibly be reached."  United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001) (quoting United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993)).  Rather, the operative inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (original emphasis).

To that end, a reviewing court must play "a very circumscribed role in gauging the sufficiency of the evidentiary foundation upon which a criminal conviction rests."  United States v. Blasini-Lluberas, 169 F.3d 57, 62 (1st Cir. 1999).  We will give considerable deference to a jury's assessment of the evidence, and we will disturb the jury's verdict only if it is premised upon "evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative."  United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997).  That is to say, we will reverse only if the verdict is irrational.  See United States v. Berrios, 132 F.3d 834, 843 (1st Cir. 1998) ("[W]e must consider the evidence in the light most favorable to the verdict and reverse only if no rational trier of fact could have found him guilty.").

The RICO count alleged a violation of 18 U.S.C. § 1962(c), which provides in pertinent part:

> It shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The meaning of "enterprise" and "pattern of racketeering activity" is explicated in § 1961:

> (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
>
> (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

The Supreme Court has repeatedly indicated that courts should take a "natural and commonsense approach" in assessing the elements of a RICO violation. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237 (1989); see Reves v. Ernst & Young, 507 U.S. 170, 179 (1993); United States v. Turkette, 452 U.S. 576, 580-81 (1981); see also United States v. Boylan, 898 F.2d 230, 250 (1st Cir. 1990) ("In the absence of any pat formula, the Court has instructed us to use a flexible approach . . . 'deriv[ing] from a common-sense, everyday understanding of RICO's language and Congress' gloss on

-9-

it.'") (quoting <u>H.J. Inc.</u>, 492 U.S. at 241).  Against this backdrop, we now turn to Connolly's specific claims.

## A.  "Enterprise"

### 1.  The Charge

Count 1 of the superceding indictment alleged that Connolly, Bulger, Flemmi, and others were members of an "enterprise," that is to say, "a group of individuals associated in fact," 18 U.S.C. § 1961(4), and that this enterprise,

> through its members and associates, acted to protect James Bulger, Stephen Flemmi and their associates, including Francis P. Salemme and those in the Winter Hill Gang, from arrest and prosecution for criminal activities including murder, loan sharking, illegal gambling, extortion, obstruction of justice, and bribery; and it acted to facilitate those criminal activities of Bulger, Flemmi, and their associates.

The indictment further alleged that the enterprise protected and fostered its members' criminal activities by

> (1) providing Bulger and Flemmi with confidential law enforcement information regarding Grand Jury investigations, court-authorized electronic surveillance, and other investigative efforts; (2) deflecting and squelching prosecutions and criminal investigations of their crimes; and (3) improperly preserving their status as FBI informants through the filing of misleading official reports and by failing to report information relating to Bulger and Flemmi which was material to the investigation of criminal activity.

The indictment distinguishes this association-in-fact enterprise from the Winter Hill Gang and La Cosa Nostra, though individual

-10-

affiliations do overlap.  The indictment also alleges that members of the enterprise committed fourteen different "racketeering acts," which included several acts of bribery, obstruction of justice, and extortion.

## 2.  The Evidence

Kevin Weeks, who identified himself as Bulger's "right-hand man," was the government's star witness and provided substantial testimony regarding the existence of the enterprise. For example, Weeks testified that a special fund was created from some of the proceeds of Bulger's and Flemmi's criminal activities, and that Connolly received cash payments from that fund in exchange for a regular flow of information about law enforcement activities that might affect the group.  Additionally, Weeks testified that Connolly was the enterprise's contact in the FBI, and that Bulger had given Connolly money in return for protecting the enterprise. According to Weeks, Bulger told him that Connolly was "one of ours."  John Martorano, a member of the Winter Hill Gang, corroborated Weeks's testimony regarding Connolly's repeated receipt of gratuities in exchange for information.  Salemme likewise testified that he and Flemmi had twice set aside $5000 from the proceeds of their numbers racket to pay Connolly for the information he provided.

In return for these payments, Connolly provided a wealth of sensitive information, often with dire consequences.  For

example, Martorano testified that Connolly told Bulger that an informant named Richard Castucci had provided the FBI with information regarding the whereabouts of two fugitive Winter Hill members. Bulger told Martorano of the leak, and Martorano in turn murdered Castucci in order to silence him. Martorano also testified that Connolly had told Bulger and others that another informant, Brian Halloran, had implicated Martorano in the murder of a recalcitrant associate, Roger Wheeler. Weeks testified that Bulger, upon learning from Connolly of Halloran's betrayal, ambushed Halloran as he got into a car outside a Boston restaurant, and fatally shot both Halloran and the driver, Michael Donahue.

Martorano also testified that Connolly told Bulger and Flemmi that the FBI agents who had been working with Halloran were going to put pressure on another associate, John Callahan, to come clean about the Wheeler murder. According to Martorano, Connolly told Bulger and Flemmi that they were "all going to go to jail for the rest of our life if something doesn't happen to John Callahan." Worried about the possibility of a breach, Bulger and Flemmi convinced Martorano that Callahan had to be silenced. In an effort to deflect any attention away from the ongoing Boston investigation, Martorano lured Callahan to Florida where, with another associate, he murdered Callahan.

Weeks also testified that he and Bulger had extorted a person named Stephen Rakes into selling them a South Boston liquor

-12-

store.  After Weeks had forcibly acquired ownership of the store, Rakes's wife went to her uncle, Joseph Lundbohm, who was a detective in the Boston Police Department.  Lundbohm testified that he, in turn, went to Connolly with the problem, and Connolly stated that nothing could be done unless Rakes agreed to wear a recording device.  Lundbohm, out of fear for the safety of his niece and her husband, told Connolly that wearing a wire would be unacceptable.  Connolly did not take any action to stop the extortionate takeover, nor did he report the incident to his superiors.

As for Connolly's efforts to derail the United States v. Salemme prosecution, Weeks testified that on December 23, 1994, Connolly came to the South Boston liquor store that Weeks and Bulger had extorted from the Rakes, looking for Bulger.  Only Weeks was on the premises, however, and Connolly led him to the inside of the walk-in refrigerator at the back of the store where electronic surveillance would be difficult.  There, Connolly told Weeks that he had just learned that federal indictments were pending against Bulger and Flemmi and that agents planned to make arrests over the holidays.  Even though Connolly no longer worked at the FBI, he told Weeks that he was certain of this information because it had come from then-FBI Assistant Special Agent in Charge Dennis O'Callaghan.  Connolly also indicated that only four people in the FBI knew about the pending indictment.  Connolly instructed Weeks to pass along the information to Bulger and Flemmi immediately.

Weeks did so. Flemmi, in turn, passed along the information to Salemme. Bulger and Salemme both skipped town and managed to avoid arrest. Salemme was ultimately arrested eight months later. Bulger's whereabouts remain unknown.

Weeks also testified that he and Connolly had worked together to compose a letter that they submitted anonymously to Judge Mark Wolf, the United States District Judge presiding over the United States v. Salemme case. The letter, printed on Boston Police Department letterhead, claimed to be from three disgruntled Boston Police Officers, and stated that the wiretaps the government was planning to use in its prosecution had been illegally obtained. Judge Wolf testified that the letter had caused him to order the parties to submit briefs, to hold a number of pretrial hearings, and to hear testimony on the contents of the letter. Weeks testified that Connolly eventually told him the identities of the confidential informants who had worn the wiretaps, and Weeks passed along this information to Flemmi and Salemme in jail.

Finally, Weeks testified that Connolly feared that Flemmi would divulge Connolly's involvement in the enterprise and name him as the person who had leaked the news of the indictments. Connolly, through Weeks, convinced Flemmi to testify that Connolly's former FBI supervisor, John Morris, had tipped him off about the indictments. However, Morris had been transferred out of Boston in 1991, long before the indictment issued. According to

Weeks, Connolly advised Weeks that Flemmi should testify that Morris had learned of the impending indictments through what is known as a "pros memo" (i.e., prosecution memo) that Morris had seen while in Washington. Flemmi ultimately testified to that effect during hearings before Judge Wolf.

## 3. The Legal Requirements for an Enterprise

As the Supreme Court indicated in <u>Turkette</u>, the government is required to prove both the existence of an "enterprise" and a "pattern of racketeering activity."

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

<u>Turkette</u>, 452 U.S. at 583 (citation omitted). As this passage makes clear, an enterprise is not merely a related assortment of criminal activities. Rather, there must be some goal — "a purpose

-15-

of engaging in a course of conduct" — beyond the isolated benefit that can redound from the commission of each criminal act, and there must be an "ongoing organization" with "associates function[ing] as a continuous unit." Id. The organization need not be formal or have an "ascertainable structure." United States v. Patrick, 248 F.3d 11, 19 (1st Cir. 2001). To the contrary, it need only be a "group of persons associated together for a common purpose of engaging in a criminal course of conduct." United States v. Owens, 167 F.3d 739, 751 n.6 (1st Cir. 1999) (quoting United States v. Doherty, 867 F.2d 47, 68 (1st Cir. 1989)) (modification omitted).

**4. Connolly's Arguments**

a. Continuity

Connolly argues that the evidence failed to demonstrate "that the members of the alleged enterprise had functioned as an ongoing organization" (original emphasis). In pressing this claim, he focuses on the fourteen racketeering acts alleged in the indictment.[4] These fourteen acts were submitted to the jury for a

_____

[4] Racketeering Acts 1 through 10 allegedly took place during Connolly's tenure as an FBI agent. Act 1 alleged that Connolly took a bribe from Bulger and Flemmi. Acts 2 through 5 alleged that Connolly paid bribes to Morris on behalf of Bulger and Flemmi. Act 6 pertained to Connolly's involvement in the extortion of Rakes. Acts 7 through 9 concerned Connolly's sharing of confidential law enforcement information that led to the killings of Castucci, Callahan, and Halloran. Act 10 alleged that Connolly, working with Morris, had informed Bulger and Flemmi of a court-authorized wiretap and an ongoing grand jury investigation into illegal gambling activity. Racketeering Acts 11 through 14 allegedly took

-16-

determination of "proven beyond a reasonable doubt" or "not proven beyond a reasonable doubt."  Of the fourteen, the jury found nine of them "not proven beyond a reasonable doubt."  Of the racketeering acts found by the jury to be "proven beyond a reasonable doubt," one was an act of bribery in 1982 or 1983, and the other were four acts of obstruction of justice in the mid- to late-1990s in connection with the United States v. Salemme prosecution.

Connolly cites these findings to argue that the government had failed to prove "continuity" in the enterprise, i.e., that the enterprise had functioned as an ongoing organization over the period of time alleged, from September 1975 to September 1998.  Since the jury found that all but one of the alleged racketeering acts dating from the 1970s and 1980s had not been proven beyond a reasonable doubt, Connolly argues that there was an insufficient basis for the jury to conclude that Connolly was part of an ongoing criminal enterprise.  See, e.g., United States v.

_____

place during the period 1994 to 1998, after Connolly had retired from the FBI.  All four involved obstruction of justice surrounding the United States v. Salemme case and are discussed in more detail in Part II.B below.

Several of the Acts were broken down into subparts, each one having the same factual basis.  For example, the indictment divided the sixth Racketeering Act into Act 6A and 6B, "either one of which alone constitutes Racketeering Act 6."  As described on the verdict sheet, Act 6A accused Connolly of "aiding and abetting the extortion of Julie and Stephen Rakes," while 6B accused him of "aiding and abetting a conspiracy to extort Julie and Stephen Rakes."

-17-

Pelullo, 964 F.2d 193, 212 (3d Cir. 1992) (noting that RICO enterprises should be "distinguished from individuals who associate for the commission of sporadic harm").

We reject this argument for two reasons. First, the government introduced significant evidence of the existence of the enterprise apart from the specified racketeering acts. For example, Weeks, Martorano, and Salemme testified about several payments made to Connolly over the period in question that do not appear in the alleged racketeering acts. They also testified that these payments were made to guarantee the flow of confidential law enforcement information from Connolly to members of the enterprise. This testimony provided evidence of an ongoing criminal relationship between Connolly and members of the enterprise, and supported the jury's ultimate finding regarding Connolly's participation in an ongoing association-in-fact.

Second, as the government correctly argues, simply because the jury found a specified racketeering act as "unproven beyond a reasonable doubt" does not mean that the jury found the evidence relating to that act unpersuasive, in combination with other evidence in the case, on the existence of an association-in-fact enterprise. Rather, it may only mean that the government did not prove a requisite element of the underlying crime alleged as a racketeering act. For example, the district court instructed the jury that in order to prove Act 1 — that Connolly had accepted a

bribe — the government had to demonstrate that Connolly had "demanded, sought, or received a thing of value as a quid pro quo, or in return for a promise, implicit or stated, to do or omit to do a particular act in violation of his lawful duty." In returning a finding of "unproven," the jury could have concluded that the evidence underlying Act 1, while failing to demonstrate this requisite quid pro quo, nevertheless demonstrated a corrupt gratuity evidencing the existence of an illegal enterprise.

Likewise, Racketeering Act 7, as described on the verdict sheet, alleged that Connolly had committed obstruction of justice by "alerting Bulger that Richard Castucci was an informant." The district court instructed the jury that in order to prove obstruction of justice, the government had to demonstrate that Connolly had knowingly endeavored to obstruct or impede a pending judicial proceeding. The court also instructed the jury that "[a] judicial proceeding is pending once a grand jury, for example, begins its investigation or when an indictment has been returned." The jury might have concluded, however, that Connolly leaked information regarding Castucci for the purpose of frustrating an FBI investigation, and not to obstruct the grand jury proceedings.

Hence, the fact that nine of the fourteen enumerated racketeering acts were found "unproven" does not compel a finding of no continuity in the enterprise. The evidence relating to those acts remained available to the jury in its evaluation of the

enterprise element of the RICO charge. Cf. United States v. Vastola, 899 F.2d 211, 222 (3d Cir.) (holding that findings of not guilty on three of four alleged predicate racketeering acts do not mandate judgment of acquittal on RICO count), vacated on other grounds, 497 U.S. 1001 (1990). That being so, the inquiry on appeal is whether the jury, in light of the totality of the evidence, was presented with sufficient evidence of "continuity" to support a conviction. See United States v. Powell, 469 U.S. 57, 67 (1984). Given the testimony of Weeks, Martorano, and others recounting a regular course of criminal conduct over two decades, we have no difficulty in concluding that the government satisfied its burden on this point.

b. Organization

Connolly next argues that the government failed to adduce sufficient evidence demonstrating "that the members of the alleged enterprise had functioned as a continuing unit" (original emphasis). Rather, as Connolly characterizes it, the evidence demonstrated, at most, "the sporadic occurrence of [criminal racketeering] activity" by a group that had "no name, no regular business or activities, no cohesion over time, no sense of membership or ongoing association, no sharing of resources or revenues, [and] no systemic linkage or coordination of activities." Hence, according to Connolly, there were "no indicia of an organization" and, therefore, no "enterprise."

-20-

We disagree with Connolly's appraisal of the evidence, as well as his reading of the term "enterprise." The evidence showed that Connolly, Bulger, Flemmi, Salemme, and others worked together in an association-in-fact enterprise over a period of almost two decades, joining forces to protect themselves from prosecution and to further other criminal activities — some alleged in the indictment, and others not specifically alleged. There was cohesion in the group over time; the membership shared resources and revenues; there was, in fact, a sense of membership.

As for the meaning of "enterprise," there is no requirement under RICO that an enterprise have an "ascertainable structure." Patrick, 248 F.3d at 19. Indeed, as the Supreme Court noted in Turkette, "[t]here is no restriction upon the associations embraced by the [statute's] definition," Turkette, 452 U.S. at 580, and "Congress has instructed us to construe RICO 'liberally . . . to effectuate its remedial purposes.'" United States v. London, 66 F.3d 1227, 1243 (1st Cir. 1995) (quoting Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970) (reprinted in note following 18 U.S.C. § 1961)). Hence an "enterprise" need only be "a group of persons associated together for a common purpose of engaging in a criminal course of conduct." Owens, 167 F.3d at 751 n.6; see also Boylan, 898 F.2d at 242 ("What counts is whether it can be said, on the totality of the evidence, that all of the alleged

coconspirators directed their efforts towards the accomplishment of a common goal. . . .") (internal quotation marks omitted).

Construing the term "enterprise" broadly, as we must, we have no difficulty in concluding that the association-in-fact alleged in the indictment was sufficiently "organized" to support a RICO conviction, and that the government had adequately proved the existence of that enterprise to sustain a conviction. Indeed, there was a discernable structure to the enterprise, with members playing designated roles in keeping the enterprise functioning as a viable unit. For example, Martorano could be considered the head of the enterprise's enforcement division, executing individuals who could prove to be a liability. Connolly's role was that of information officer, i.e., an intelligence conduit from law enforcement. Weeks, as Bulger's "right-hand man," managed special funds and functioned as an intermediary between Bulger and others.

Connolly insists, however, that Bulger, Flemmi, and others were actually members of the Winter Hill Gang, and that this somehow forecloses the possibility of membership in another enterprise. We fail to follow this logic. As the indictment makes clear, the alleged enterprise in this case — while perhaps overlapping in membership and some criminal activities with the Winter Hill Gang and even La Cosa Nostra — was a separate entity, distinguishable from both of these other criminal organizations. Membership in the Winter Hill Gang does not, ipso facto, preclude

membership in another criminal enterprise. While the evidence demonstrated that Bulger, Flemmi, and others were associates of the Winter Hill Gang, it also demonstrated that they were members of a separate enterprise dedicated to their own protection and the advancement of their own criminal activities. Moreover, evidence was presented suggesting that the enterprise was distinct (if not totally separate) from the Winter Hill Gang. For example, the jury heard testimony that part of the money that the enterprise's members extorted or otherwise illegally procured was used to pay bribes necessary to ensure the enterprise's survival. Moreover, Bulger told Weeks that Connolly, who was not a member of the Winter Hill Gang, was nevertheless "one of ours." The jury could therefore have readily inferred the existence of a continuing unit which included Connolly and was distinct from the Winter Hill Gang.

### B. "Pattern of Racketeering Activity"

### 1. The Predicate Acts

Racketeering Acts 11 and 12 occurred in late 1994 or early 1995 and concerned Connolly's tip-offs to Bulger, Flemmi, and Salemme regarding their indictment. Racketeering Act 13 occurred in March 1997 and concerned the fraudulent, anonymous letter that Connolly sent to Judge Wolf purporting to be from three police officers. Racketeering Act 14 occurred in 1998 and concerns the

false testimony that Flemmi gave after being coached and directed by Connolly.[5]

## 2.  The Legal Requirements for a Pattern

While the RICO statute does not define in absolute terms what constitutes a "pattern of racketeering activity," it does set a minimum requirement:  proof of a pattern of racketeering activity "requires [proof of] at least two acts of racketeering activity" within a ten-year period.  18 U.S.C. § 1961(5).  The Supreme Court, interpreting RICO, has stated that "while two acts are necessary, they may not be sufficient."  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14 (1985).  "It is not the number of predicates" that determines whether they constitute a pattern of racketeering activity; rather, it is "the relationship that they bear to each other or to some external organizing principle."  H.J. Inc., 492 U.S. at 238 (emphasis added).  The two factors most pertinent to this determination, according to the Court, are relatedness and continuity.  See id. at 239 ("It is this factor of continuity plus

---

[5] In evaluating Connolly's argument regarding the "pattern of racketeering activity" element, we do not rely on the "unproven" Racketeering Acts (1 through 3 and 5 through 10) described in note 4, supra.  The Third Circuit, however, has indicated that a reviewing court need not be constrained by the jury's findings regarding the individual racketeering acts in determining whether the evidence, taken as a whole, supports an ultimate finding of guilt through a "pattern of racketeering activity."  See Vastola, 899 F.2d at 222-23.  Since the "proven" racketeering acts (11 through 15) establish the requisite pattern, we need not consider whether other evidence adduced at trial supports such a finding.

relationship which combines to produce a pattern.") (original emphasis) (citation omitted).

Continuity, according to the Supreme Court, can refer "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Id. at 241. We have previously indicated that it is "'difficult to formulate in the abstract any general test' for the continuity required for a pattern." Apparel Art Int'l v. Jacobson, 967 F.2d 720, 722 (1st Cir. 1992) (quoting H.J. Inc., 492 U.S. at 241); see also Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 15 (1st Cir. 2000) ("We have more than once remarked upon the difficulty of articulating concrete guidelines for this 'continuity plus relationship' standard for identifying a pattern."). In H.J. Inc. the Supreme Court noted that Congress chose not to define "pattern of racketeering activity" with any degree of specificity in the RICO statute. Hence, the Court instructed lower courts to adopt a flexible approach to RICO claims, employing a "commonsense, everyday understanding of RICO's language and Congress' gloss on it." H.J. Inc. 492 U.S. at 241. Lower courts, in turn, have repeatedly looked to one guidepost contained in H.J. Inc.: "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time," or by evidence that the acts "include a specific threat of repetition extending indefinitely

-25-

into the future." Id. at 242. Because RICO was intended by Congress to apply only to enduring criminal conduct, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." Id.; Efron, 223 F.3d at 15; Apparel Art, 967 F.2d at 723.

## 3. Connolly's Argument

Connolly concedes that the four racketeering acts at issue are sufficiently related for RICO purposes. Each act served to protect members of the enterprise. Connolly insists, however, that the four racketeering acts simply constituted a "single criminal episode," that they did not present the threat of ongoing conduct, and that they therefore were not a pattern of racketeering activity. We disagree.

While we have previously indicated that "[w]e can be reasonably certain" that the pattern requirement "does not encompass a single criminal episode, a single 'crime' (in the ordinary, nontechnical sense of that word)," Apparel Art, 967 F.2d at 722 (original emphasis), we have also indicated that a "single criminal episode" is something narrow in scope and purpose, for example, a single interstate bank robbery. As we explained in Apparel Art, a bank robbery could include several different "crimes" (in the technical sense of the word) — such as gun possession, threatening a teller, stealing a getaway car, and eventually lying about one's participation — but they nevertheless

do not add up to a "pattern of racketeering activity." See id. The instant case, however, is altogether different. Here, there were at least three different "episodes" — the disclosing of the indictment, the fabricated letter, and the perjured testimony — each planned and executed independently of the others over a period of years, and each the result of detailed planning and scheming by members of a criminal enterprise seeking to impede the criminal prosecutions of their cohorts. This is precisely the kind of activity that RICO was intended to forestall. See H.J. Inc., 492 U.S. at 247-48.

As for the threat of future criminal conduct, the racketeering acts at issue were part of an ongoing criminal enterprise undertaken to facilitate future criminal acts by other members of that enterprise. The enterprise sought to insure that its members would never be brought to justice, and indeed, one of them is still at large. As the government describes it, the enterprise engaged in a "do-whatever-is-necessary" long-term pattern of criminal activity that threatened ongoing criminal conduct of the sort that RICO was designed to prevent.[6] In short,

---

[6] The Second Circuit has noted that courts have been quicker to find RICO violations "in cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals." United States v. Aulicino, 44 F.3d 1102, 1111 (2d Cir. 1995). We agree with the common-sense conclusion that in such situations, there is a greater threat of future criminal conduct. Of course, as explained in the text, there is no hard and fast rule, and the fact that there may be "inherently unlawful" conduct underlying the RICO charge would not prevent us from concluding

-27-

there was ample evidence supporting the jury's conclusion that the government had satisfied the "pattern of racketeering activity" element of the crime.

**III.**

In sentencing Connolly, the district court relied upon the Pre-Sentence Report ("PSR") prepared by the U.S. Probation Office. The PSR calculated the appropriate sentence after navigating through a series of cross-references as follows (with the cross-referenced subject matter underlined for the reader's convenience):

- Under U.S.S.G. § 2E1.1, the base offense level for a RICO conviction is the greater of either (i) 19, or (ii) the offense applicable to the underlying racketeering activity, i.e., obstruction of justice.

- As for the underlying racketeering activity, under U.S.S.G. § 2J1.2, the base offense level for obstruction of justice is 12. Subsection (c), however, indicates that if the obstruction of justice interfered with the investigation or prosecution of a criminal offense, the court should look to § 2X3.1 (accessory after the fact) with respect to the criminal offense

that there was nevertheless no pattern of racketeering activity. See, e.g., Miranda v. Ponce Fed. Bank, 948 F.2d 41, 45-46 (1st Cir. 1991).

obstructed, provided that the corresponding offense level is greater than 12.

- Section 2X3.1 provides that the base offense level for being an <u>accessory after the fact</u> is 6 levels lower than the offense level for the <u>underlying offense</u>, but in no event less than 4, or more than 30.

- The PSR identified first-degree murder as the <u>underlying offense</u> because (1) Connolly's racketeering activities concerned the obstruction of the prosecution of <u>United States</u> v. <u>Salemme</u>, and (2) the most serious of the underlying offenses charged in the <u>Salemme</u> indictment was <u>first-degree murder</u>.

- Under § 2A1.1, the base offense level for <u>first-degree murder</u> is 43.

Under § 2X3.1, however, the maximum base offense level for accessory after the fact is 30. The Probation Office therefore recommended a base offense level of 30. The PSR determined that no adjustment was necessary for the multiple counts, or for any other reason, and that Connolly should be placed in Criminal History Category I. The corresponding sentencing range for Category I, when combined with an offense level of 30, is 97 to 121 months.

At sentencing, Connolly challenged the calculation of the offense level, arguing that he was not "subjectively aware" of the more serious charges alleged in the <u>Salemme</u> indictment, and that

first-degree murder should therefore not be considered the "underlying offense" under U.S.S.G. § 2X3.1. The district court properly overruled Connolly's objection. See United States v. McQueen, 86 F. 3d 180, 184 (11th Cir. 1996) ("Neither § 2J1.2(c)(1) nor § 2X3.1 requires such knowledge as a prerequisite to application of the offense level for the 'underlying offense.'"). It then adopted the factual findings and the Guidelines calculation contained in the PSR, and sentenced Connolly to the maximum of the applicable range, i.e., 121 months.

On appeal, Connolly abandons his subjective knowledge argument and presses a new argument that the district court made a "basic mistake" in sentencing when it referenced the murder guideline "without conducting any fact-finding" as to what exactly constitutes the "underlying offense." Since Connolly raises this objection for the first time on appeal, we review for plain error only. United States v. Henderson, 320 F.3d 92, 102 (1st Cir. 2003); see United States v. Grant, 971 F.2d 799, 803 (1st Cir. 1992) (noting that "as a general rule, appellant may not 'switch horses mid-stream' and raise new legal arguments not made the basis for objections in the district court"). Accordingly, Connolly "bears the burden of proving (1) an error, (2) that is plain, and (3) that affects substantial rights." United States v. Downs-Moses, 329 F.3d 253, 263 (1st Cir. 2003). Assuming he can meet this high hurdle, Connolly must then demonstrate that the error

"seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Matos, 328 F.3d 34, 43 (1st Cir. 2003).

The plain language of the applicable sections of the Guidelines does not support Connolly's argument. The obstruction of justice guideline, § 2J1.2(c), provides that:

> If the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above.

(emphasis added). We fail to see how this language obliges an evidentiary inquiry into the substance of "that criminal offense." Moreover, the commentary to section 1B1.5 (governing the interpretation of cross-references) indicates that,

> A reference may direct that, if the conduct involved another offense, the offense guideline for such other offense is to be applied. . . . Where there is more than one such offense, the most serious such offense . . . is to be used.

U.S.S.G. § 1B1.5, comment. (n.1). The PSR followed these directives to the letter. The jury found that Connolly had obstructed the prosecution in United States v. Salemme at various times from late 1994 to mid-1998, including after the grand jury had returned a superceding indictment charging Flemmi, Bulger, Salemme, and others with a number of crimes, including first-degree murder. The Probation Office reasonably looked to the most serious

-31-

offense contained in the superseding indictment, and, as explained above, calculated the base offense level at 30.

This is not to say that a factual inquiry into the underlying offense would never be appropriate. For example, if a defendant were convicted of obstruction of justice for lying in a grand jury proceeding, a sentencing court would be justified in probing deeper into the nature of the underlying offense. Otherwise, the perjurer, through his false testimony, could cause an indictment for a minor (instead of a serious) crime to issue, and then gain the benefit of his perjury if the court were to rely solely on the indictment in determining the underlying offense. The converse, of course, is also true — an overzealous prosecutor could seek to enhance the perjurer's sentence by spuriously convincing a grand jury to increase the counts in an indictment. Hence, the Fourth Circuit has held that, in such a situation, a factual inquiry into what constitutes the underlying offense would not be inappropriate. See United States v. Dickerson, 114 F.3d 464, 467-68 (4th Cir. 1997). The Ninth Circuit, citing Dickerson, indicated in United States v. Arias, 253 F.3d 453 (9th Cir. 2001), that a factual inquiry into the underlying offense would be appropriate only if there were a "genuine dispute" as to its substance. Id. at 461 (emphasis added).

Connolly relies unpersuasively on Dickerson and Arias in pressing his claim. Unlike Dickerson, Connolly did not perjure

himself before a grand jury, and there was therefore no risk of over- or under-charging of the indictment. And unlike Arias, there is no genuine dispute in this case as to the underlying offense. When Connolly wrote the fraudulent letter to Judge Wolf, and when he instructed Flemmi on how to lie on the witness stand, the Salemme prosecution included charges of first-degree murder. Moreover, Weeks testified during the trial that Connolly's goal was to get the entire case against Flemmi "tossed out," and substantial evidence adduced at trial supports that conclusion. Finally, even assuming that an inquiry into the underlying offense would be appropriate in this case, and assuming it was error for the district court not to undertake that inquiry sua sponte, any such error would be far from "plain," i.e., "clear, in the sense that it was obvious." United States v. Geronimo, 330 F.3d 67, 74-75 (1st Cir. 2003) (internal quotation marks omitted). Indeed, the fact that Connolly, who was ably represented by counsel below, only belatedly turns to this argument, and cites only two cases from other jurisdictions, belies any claim that the error was truly "obvious."

Since Connolly has failed to demonstrate that the district court committed any error — plain or otherwise — when it determined that first-degree murder was the "underlying offense" for purposes of U.S.S.G. § 2J1.2(c) and § 2X3.1, we affirm the sentence imposed by the district court.

**IV.**

On the first day of trial, when the jury first entered into the courtroom, the district court judge noticed that one of the jurors was carrying a notebook. Without prompting from counsel, the judge informed the jury as follows:

> I noticed one of you came in with a notebook. I just want to alert you that I do not permit note taking. I want you to just sit and listen to the evidence and then use your collective memories as you deliberate at the conclusion of the case. Some very, very fine judges, colleagues, friends of mine, they do permit note taking. I don't. I want you to just sit back and pay attention. So that is the way we will proceed.

Connolly did not object to this instruction, nor did he seek clarification or modification of it. The parties do not recall seeing any jurors taking notes in the courtroom over the course of the trial.

Almost a month after the trial had ended, an article appeared in the Boston Globe which stated, in pertinent part:

> Although the judge had prohibited jurors from taking notes during the trial, some jurors went home and jotted down testimony they had heard that day, according to [two jurors]. "A couple of jurors took notes at night, which was very helpful [during deliberations]," [one juror] said.

(second modification in original). Arguing that the jury may have relied on "extraneous prejudicial information" during deliberations, Connolly filed a motion for an evidentiary inquiry into whether jurors had, in fact, taken notes during trial and

-34-

whether they had considered any such notes during their deliberations. In a brief order, the district court denied the request:

> On the first day of trial I told the jurors I did not permit note taking during trial . . . . I did not, however, forbid the jurors from making notes of their impressions of the evidence when not in court. Indeed, writing material was provided to the jurors in their deliberating room. It was expected that jurors would make notes and use them during their deliberations. There is no occasion for the inquiry requested by Defendant. Defendant's Motion, therefore, is DENIED.

Connolly now assigns error to this decision,[7] asking that we remand the case for further inquiry into this purported juror "misconduct."

We review the district court's response to an allegation of juror misconduct only for abuse of discretion. See United States v. Ortiz-Arrigoitia, 996 F.2d 436, 442 (1st Cir. 1993) (indicating that district court has broad discretion to "determine the nature and extent of its inquiry" into juror improprieties); Mahoney v. Vondergritt, 938 F.2d 1490, 1492 (1st Cir. 1991) (noting

---

[7] Connolly unsuccessfully renewed this claim in his successive applications for release pending appeal. The district court, denying the request for release, concluded that "no prejudice to the Defendant resulted from the jurors' considering notes they may have taken at night." In our order denying the same, we noted the article's ambiguity with respect to whether the alleged notes actually made their way into the jury room, and, citing United States v. Bassler, 651 F.2d 600, 601-02 (8th Cir. 1981), we indicated that "[e]ven assuming that the jurors consulted these notes during deliberations, it is far from clear that prejudice should be presumed in the absence of a cautionary instruction [regarding the proper use of notes during deliberations]."

that district court judges have "broad discretion in determining how to respond to allegations of extraneous influence on jurors"); Boylan, 898 F.2d at 258 ("[T]he district court has broad discretion to determine the type of investigation which must be mounted.").

Federal Rule of Evidence 606(b) codifies the "near-universal and firmly established common-law rule" that prohibits the admission of juror testimony to impeach a jury verdict. Tanner v. United States, 483 U.S. 107, 117 (1987). There are significant policy considerations underlying such a rule, including finality, maintaining the integrity of the jury system, encouraging frank and honest deliberations, and the protection of jurors from subsequent harassment by a losing party. See McDonald v. Pless, 238 U.S. 264, 267–68 (1915). Rule 606(b) does, however, create an exception to the common-law rule in situations where "extraneous prejudicial information [is] improperly brought to the jury's attention." Fed. R. Evid. 606(b). Despite this exception, we have nevertheless warned that "[c]ourts generally 'should be hesitant[ ] to haul jurors in after they have reached a verdict . . . to probe for potential instances of bias, misconduct, or extraneous influences.'" Neron v. Tierney, 841 F.2d 1197, 1205 (1st Cir. 1988) (quoting United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983)). A court should only conduct such an inquiry when "reasonable grounds for investigation exist," i.e., "there is clear, strong, substantial and incontrovertible evidence that a

specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." Moon, 718 F.2d at 1234 (citation omitted). Connolly cannot meet this high standard.

The Boston Globe article indicated that two jurors made notes at home some evenings regarding that day's in-court testimony. We agree with the district court that this note-taking, assuming it actually happened, was not inconsistent with the court's instructions. The judge told the jurors that he wanted them to focus on the testimony, not in-court note-taking: "I want you to just sit back and pay attention." Such a prescript did not foreclose the possibility of note-taking outside of court. Indeed, as the district judge noted, the jurors were provided with writing materials in the jury room from the outset of trial. Hence, the note-taking described in the Globe article did not constitute juror misconduct.

Moreover, assuming that any notes actually made their way into the jury room during deliberations,[8] the notes cannot be considered an "extraneous" or "extrinsic" influence. In Bassler, the district court instructed the jury at the beginning of the trial that note-taking was not permitted. Like the two jurors in Connolly's trial, one of the Bassler jurors understood this instruction to mean that "no notes should be taken during the actual trial time but could be taken during recess or other times

_____

[8] We have previously noted the Globe article's ambiguity on this point. See supra note 7.

-37-

outside actual trial time." Id. at 602. The juror therefore took notes at the end of each day, and these notes eventually found their way into the jury room during deliberations. The Bassler court held that the juror's daily notes could not be considered an improper "extrinsic influence" because they were, in fact, intrinsic. We agree, and "[i]ntrinsic influences on a jury's verdict are not competent to impeach a verdict." Id. Hence Connolly cannot rely on the notes to demonstrate prejudice. Cf. United States v. Balsam, 203 F.3d 72, 86 (1st Cir. 2000) (indicating that sharing of notes in open court by jurors does "not raise the same specter of prejudice as improper outside influences upon the jury") (emphasis added).

Even if the notes could, somehow, be considered "extrinsic," Connolly falls far short of providing specifics regarding any prejudice. Instead, he only insists that the district court should have conducted "an inquiry." Tellingly, he does not suggest what form this inquiry should take. Rather, he simply asks that we remand with instructions to the district court to "do what has to be done to ferret out the truth." He does not identify any witnesses he would call at an evidentiary hearing, or what the substance of any testimony could possibly be. Indeed, Connolly has made no proffer of any evidence other than the Boston Globe article. Instead, there is only speculation, and mere

speculation can hardly be considered "clear, strong, substantial and incontrovertible evidence."  Moon, 718 F.2d at 1234.

We have repeatedly said that courts should respond to allegations of juror impropriety in a manner appropriate to the facts and circumstances at hand. See Ortiz-Arrigoitia, 996 F.2d at 443 ("The trial judge is not . . . shackled to a rigid and unyielding set [of] rules and procedures that compel any particular form or scope of inquiry."); Boylan, 898 F.2d at 258 ("We abjure imposition of a rigid set of rules for the conduct of inquiries into the presence or extent of extrinsic influences."); see also Moon, 718 F.2d at 1234 ("[E]ach situation in this area is sui generis.").  Since we agree with the district court's conclusion that its instructions to the jury did not preclude note-taking outside the courtroom, and since Connolly has failed to make any substantial evidentiary showing regarding prejudicial impropriety, the district court properly exercised its discretion in denying Connolly's motion for further inquiry.

## V.

For the foregoing reasons, the judgment of conviction entered on the jury's verdict and the sentence of the district court are **AFFIRMED**.


        **SO ORDERED**.