******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RICHARD BUSH
(SC 19492)

Rogers, C. J., and Palmer, Eveleigh, McDonald and Robinson, Js. *

*Argued October 12, 2016—officially released April 18, 2017*

*Adam E. Mattei*, assistant state's attorney, with whom were *C. Robert Satti, Jr.*, supervisory assistant state's attorney, and, on the brief, *John C. Smriga*, state's attorney, and for the appellant (state).

*Pamela S. Nagy*, assistant public defender, for the appellee (defendant).

*Opinion*

ROBINSON, J. This certified appeal presents two significant issues, namely: (1) whether a court, in determining if sufficient evidence of an enterprise exists to sustain a conviction of racketeering in violation of the Corrupt Organizations and Racketeering Activity Act (CORA), General Statutes § 53-393 et seq., may consider the entire record, or is limited to the evidence concerning only those predicate "incidents of racketeering activity" found by the jury in the special verdict required by General Statutes § 53-396 (b);[1] and (2) the degree to which a trial court has discretion to deny a motion for a continuance filed by a criminal defendant that seeks time to prepare for trial after that defendant had elected, pursuant to *Faretta* v. *California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975), to discharge his attorney and proceed as a self-represented party. The state appeals, upon our grant of its petition for certification,[2] from the judgment of the Appellate Court reversing the judgment of the trial court, rendered after a jury trial, convicting the defendant, Richard Bush, of six counts of the sale of narcotics by a person who is drug-dependent in violation of General Statutes § 21a-277 (a), six counts of sale of narcotics within 1500 feet of a school by a person who is drug-dependent in violation of General Statutes §§ 21a-277 and 21a-278a (b), one count of conspiracy to sell narcotics in violation of General Statutes §§ 53a-48 and 21a-278 (b), and one count of racketeering in violation of General Statutes § 53-395 (c).[3] *State* v. *Bush*, 156 Conn. App. 256, 258–59, 112 A.3d 834 (2015). On appeal, the state claims that the Appellate Court improperly concluded that: (1) the defendant was entitled to a judgment of acquittal with respect to the racketeering conviction because the two predicate acts of racketeering, identified by the jury pursuant to § 53-396 (b), did not constitute sufficient evidence of an enterprise; and (2) a new trial was required for the remaining offenses because the denial of a continuance effectively deprived the defendant of his right of self-representation. With respect to the racketeering conviction, we conclude that the Appellate Court improperly circumscribed its sufficiency of the evidence analysis by limiting it to the two predicate acts, but nevertheless properly determined that there was insufficient evidence to support the racketeering conviction. With respect to the other convictions, we conclude that the Appellate Court improperly determined that the denial of a continuance effectively deprived the defendant of his right of self-representation. Accordingly, we affirm in part and reverse in part the judgment of the Appellate Court.

The record and the opinion of the Appellate Court set forth the following background facts and procedural history. "The charges upon which the defendant was brought to trial were all based upon his alleged involve-

ment in seven separate sales of cocaine to a police informant, David Hannon, during an undercover police investigation of illegal drug activity in the area of Pembroke and Ogden Streets in Bridgeport between late June through early November, 2010." Id., 259. As will be discussed more fully in part I B of this opinion, during that time period, the investigating task force of officers from the Bridgeport Police Department and the Connecticut State Police obtained extensive audiotape and videotape surveillance footage of these sales, in which the defendant, working from the porch of his duplex home, which directly abutted the sidewalk on Pembroke Street, sold cocaine to Hannon, or facilitated sales to Hannon by six other drug dealers, namely, David Moreland, Jason Ortiz, Willie Brazil, Raymond Mathis, Carlos Lopez, and Kenneth Jamison.[4]

"In an amended long form information dated January 3, 2012, the state charged the defendant, more particularly, with: one count each of sale of narcotics by a person who is not drug-dependent and sale of narcotics within 1500 feet of a school by a person who is not drug-dependent in connection with each such alleged sale; and one count each of conspiracy to sell narcotics and racketeering based upon his alleged involvement in all seven such alleged sales, as specially pleaded both in the conspiracy count, as overt acts in furtherance of the alleged conspiracy, and in the racketeering count, as incidents of racketeering activity claimed to prove his involvement in a pattern of racketeering activity, as required by . . . § 53-396 (a). The jury found the defendant guilty of the lesser included offenses of sale of narcotics by a person who is drug-dependent and sale of narcotics within 1500 feet of a school by a person who is drug-dependent based upon his proven involvement in sales of cocaine to Hannon on six of the seven dates specified in the information, particularly June 30, July 14, July 16, August 6, August 24, and November 9, 2010. It found him not guilty, however, of all charges based upon the alleged sale of drugs to Hannon on June 25, 2010, the first date specified in the information. The jury also found the defendant guilty of both conspiracy to sell narcotics and racketeering, specifying as to the latter charge, in a special verdict returned pursuant to § 53-396 (b), that the sole basis for its finding that the defendant had engaged in a pattern of racketeering activity as a member of an enterprise was his involvement in the sale of cocaine on two of the seven dates specified in the information, June 30 and November 9, 2010, which it found to have constituted 'incidents of racketeering activity.' The trial court later sentenced the defendant on all charges of which he was convicted to a total effective sentence of twenty years incarceration." (Footnote omitted.) Id., 259–60.

The defendant appealed from the judgment of conviction to the Appellate Court. Although the defendant raised numerous claims on appeal, the Appellate Court

only reached the two that it deemed dispositive.[5] See id., 259 n.2. Specifically, the Appellate Court first concluded that the defendant was entitled to a judgment of acquittal on the racketeering charge on the ground that "there was insufficient evidence to support his racketeering conviction because the state failed to prove either the existence of an enterprise formed for the common purpose of selling narcotics or that he was associated with such an enterprise." Id., 265. The Appellate Court further concluded that a new trial was required with respect to the other charges because the trial court had abused its discretion in denying the defendant's request for a continuance after he elected, during jury selection, to represent himself. Id., 288–89. This certified appeal followed. See footnote 2 of this opinion. Additional facts and procedural history will be set forth as necessary.

I

We begin with the state's claim that the Appellate Court improperly concluded that there was insufficient evidence to support the defendant's racketeering conviction. The record sets forth the following additional relevant facts and procedural history. Although the jury convicted the defendant of a total of six cocaine sales to Hannon that took place between the dates of June 30 and November 9, 2010, the Appellate Court noted that the special verdict form, rendered pursuant to § 53-396 (b), indicated that the "defendant's racketeering conviction was expressly predicated" on the two cocaine sales that occurred on June 30 and November 9, 2010.[6] State v. Bush, supra, 156 Conn. App. 263. The Appellate Court confined its analysis of the defendant's racketeering conviction only to the events of those two days. Id. It observed that, "[o]n June 30, 2010, Hannon met with members of a task force of officers from the Bridgeport Police Department and the Connecticut State Police Department to arrange for a controlled buy of cocaine from . . . Ortiz at the defendant's home on Pembroke Street in Bridgeport. To that end, Hannon telephoned Ortiz before arriving at the defendant's home, and also telephoned the defendant's home phone number. Prior to Hannon's arrival at the defendant's home, Ortiz, who was then under surveillance by other members of the task force, went to the rear of the home, then returned to the front porch with a small blue bag in his hand, which he later put in his mouth.[7] When Hannon arrived at the defendant's home, the defendant emerged from his backyard, walked past Hannon's vehicle while looking inside it, then continued to the street corner, where he gestured to Ortiz by raising his hand in the air. Ortiz then approached Hannon's vehicle and opened the door, whereupon the defendant came up behind Ortiz, reached inside the vehicle, and tapped hands with Hannon. Hannon gave Ortiz money, in exchange for which Ortiz gave Hannon the blue bag of cocaine that had been in his mouth. Meanwhile, another man approached the defendant. After completing the

transaction with Hannon, when the defendant gestured . . . once again, [and] Ortiz handed something to the other man in exchange for money. Ortiz and the defendant then walked together toward the defendant's backyard.[8]

"On November 9, 2010, Hannon met once again with task force members to prepare to buy drugs from the defendant. This time Hannon called the defendant, using the same cell phone number he had called on June 30, 2010, and told the defendant that he was on his way to meet him. When Hannon arrived at the defendant's home, the defendant was standing on the street corner with . . . Brazil. The defendant got into Hannon's vehicle, and he and Hannon drove off. During their ride, the defendant made a phone call in an apparent attempt to procure cocaine, which Hannon had requested. After the call, Hannon and the defendant drove back to the defendant's home. On the way back, Hannon told the defendant that he also wanted to buy a gun, which the defendant said was 'doable.' When they returned, Hannon dropped off the defendant to speak to Brazil, then pulled around the corner onto Pembroke Street, as the defendant had directed. Once he did so . . . Moreland, approached Hannon's vehicle. When Hannon told Moreland that he had given money to the defendant, Moreland gave Hannon a quantity of cocaine. The defendant later called Hannon to confirm that Moreland had given him the cocaine and to discuss further his stated interest in purchasing a gun." (Footnotes in original.) Id., 264–65.

Applying this court's explication of CORA in *State* v. *Rodriguez-Roman*, 297 Conn. 66, 82, 3 A.3d 783 (2010), the Appellate Court held that there was insufficient evidence of an association in fact enterprise to sustain the defendant's racketeering conviction under § 53-395 (c). *State* v. *Bush*, supra, 156 Conn. App. 265. In conducting its sufficiency analysis, the Appellate Court confined its factual and legal analysis to the June 30 and November 9, 2010 sales that the jury found to be the predicate acts of racketeering in its special verdict rendered pursuant to § 53-396 (b), citing *Cole* v. *Arkansas*, 333 U.S. 196, 202, 68 S. Ct. 514, 92 L. Ed. 644 (1948), for the proposition that, "[w]here . . . the verdict includes answers to interrogatories specifying the particular factual or legal [basis] upon which the verdict [rests], the court must evaluate the sufficiency of the evidence to support that verdict under the theories so specified." *State* v. *Bush*, supra, 261–63. The Appellate Court observed that, "[i]n the present case, there is no question that the defendant was personally involved in both sales of cocaine that the jury specially found to have been incidents of racketeering activity," but stated that, for purposes of liability under CORA, the "question . . . is whether those two sales, as alleged and proved at trial, were committed by the defendant and his confederate as members of a single enterprise, whose mem-

bers had joined together with one another in a web of interlocking relationships to pursue a common criminal purpose, or as separate groups of individuals who had joined together on the occasions in question to commit separate, though similar, crimes." Id., 266. The Appellate Court stated that, "[a]lthough the defendant's evident purpose on both occasions was to sell cocaine and thereby make an illegal profit—a purpose he impliedly shared with Ortiz on June 30, 2010, and with Moreland on November 9, 2010—there was no evidence either that the defendant had a long-term relationship with either of his confederates for the common purpose of selling drugs or that his two confederates had any relationship at all with each other." Id. Thus, the Appellate Court determined that the state had not established the "continuing unit" that is "required to prove . . . membership in an association in fact enterprise under § 53-395 (c)."[9] (Internal quotation marks omitted.) Id., 267. Accordingly, the Appellate Court reversed the racketeering conviction and remanded the case to the trial court "with direction to render a judgment of acquittal" on that charge. Id., 289.

In challenging the Appellate Court's conclusion that there was insufficient evidence of the existence of an enterprise, the state claims that the Appellate Court improperly limited its sufficiency analysis to the evidence specifically supporting the two predicate acts of racketeering as found by the jury on the special verdict form mandated by § 53-396 (b), rather than considering the totality of the evidence in the record encompassing all of the defendant's narcotics convictions. The state relies on several federal court decisions under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., including *United States* v. *Cianci*, 378 F.3d 71 (1st Cir. 2004), and contends that the "evidence relating to the five other sales that were not marked on the [special verdict] form as proven to be acts of racketeering was still available to the jury in determining whether the state met its burden of proving an enterprise existed and the defendant associated with the enterprise." The state argues that the Appellate Court's analysis to the contrary is inconsistent with the standard by which we review sufficiency claims, as well as the purpose of CORA, which the legislature enacted in part to allow the jury to consider the entire criminal operation.

In response, the defendant argues that the Appellate Court properly restricted its analysis to the June 30 and November 9, 2010 sales, which were the two predicate acts found by the jury pursuant to § 53-396 (b), because "the jurors rejected the five other alleged acts of racketeering . . . ." Citing *State* v. *Wassil*, 233 Conn. 174, 658 A.2d 548 (1995), *State* v. *Anderson*, 86 Conn. App. 854, 864 A.2d 35, cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005), and *Sanchez* v. *State*, 89 So. 3d 912 (Fla. App. 2012), the defendant contends that the special

verdict established key material facts, namely, that the only incidents of racketeering activity that occurred were the two sales considered by the Appellate Court. Put differently, the defendant contends that the jury's failure to find in its special verdict that the other five sales constituted "racketeering activity" operated as an acquittal, particularly insofar as the jury also found the defendant drug-dependent and acting by himself in four of the proven sales. The defendant further argues that, even if the entire record is considered, the present case is distinguishable from numerous reported federal racketeering decisions sustaining findings of an association in fact enterprise because the present case lacks even informal organizational hallmarks. The defendant contends, specifically, that the present case lacks evidence of the following: (1) of a single source for the drugs sold; (2) of sharing of weapons or profits; (3) of specific job functions; and (4) that the cocaine sold in this case came from inside the defendant's home. Finally, the defendant contends that, even if an enterprise existed among the other six dealers, there was insufficient evidence that he had associated with that enterprise. Although we agree with the state that the Appellate Court improperly circumscribed its inquiry in determining whether there was sufficient evidence of an enterprise, we nevertheless agree with the defendant that the Appellate Court properly determined that there was insufficient evidence to sustain the defendant's racketeering conviction.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multi-

tude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16–17, 115 A.3d 447 (2015).

The following background principles governing criminal liability under CORA are relevant to the issues in this certified appeal. The defendant was convicted of racketeering in violation of § 53-395 (c), which provides in relevant part as follows: "It is unlawful for any person employed by, or associated with, *any enterprise* to knowingly conduct or participate in, directly or indirectly, such enterprise through *a pattern of racketeering activity* . . . ." (Emphasis added.) General Statutes § 53-394 (e), in turn, defines " '[p]attern of racketeering activity' " as "engaging in at least two incidents of racketeering activity that have the same or similar purposes, results, participants, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents, provided the latter or last of such incidents occurred after October 1, 1982, and within five years after a prior incident of racketeering activity."[10] Section 53-394 (c) further defines " '[e]nterprise' " as "any individual, sole proprietorship, corporation, business trust, union chartered under the laws of this state or other legal entity, or any unchartered union, association or group of individuals associated in fact although not a legal entity, and includes illicit as well as licit enterprises and governmental, as well as other entities. In determining whether any unchartered union, association or group of individuals exists, factors which may be considered as evidence of association include, but are not limited to: (1) A common name or identifying sign, symbols or colors and (2) rules of behavior for individual members." Although the pattern of racketeering and enterprise elements of racketeering are distinct under CORA, they may well share common proof.[11] See *State* v. *Rodriguez-Roman*, supra, 297 Conn. 81–83.

## A

We begin with the state's claim that the Appellate Court improperly concluded that, in determining whether the state proved the existence of an enterprise under CORA, it could consider only evidence concerning the predicate acts that the jury found to have constituted a pattern of racketeering pursuant to § 53-396 (b), namely, the June 30 and November 9, 2010 sales. Whether CORA, and, particularly, the special verdict provision of § 53-396 (b), requires that the jury's finding as to the existence of an enterprise to be based solely on the evidence concerning the predicate acts specified in the special verdict presents a question of statutory interpretation over which we exercise plenary review. See *State* v. *Moreno-Hernandez*, 317 Conn. 292, 299, 118 A.3d 26 (2015). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) Id. "In interpreting the [statutory] language . . . however, we do not write on a clean slate, but are bound by our previous judicial interpretations of the language and the purpose of the statute." (Internal quotation marks omitted.) Id.

We begin with the text of § 53-396, which governs the state's pleading and proof in a prosecution for racketeering under CORA. In particular, we focus on § 53-396 (b), which requires a special verdict, because that is the subsection that led the Appellate Court to confine its sufficiency analysis in the present case to the incidents of racketeering activity that the jury found to have occurred on June 30 and November 9, 2010. See *State* v. *Bush*, supra, 156 Conn. App. 263. Section 53-396 (b) provides: "In any prosecution under this chapter the court or the jury, as the case may be, shall indicate by special verdict the particular incidents of racketeering activity that it finds to have been proved by the state beyond a reasonable doubt."

Nothing in the text of § 53-396 (b) requires a special verdict as to the enterprise element of CORA, or in any

way suggests that the proof of that element is limited to particular evidence, in contrast to its express requirement that the jury specify the "incidents of racketeering activity" that satisfy the "pattern" element. This is particularly evident when subsection (b) is read in context with subsection (a) of § 53-396, which governs the pleading of a racketeering claim under CORA. Section 53-396 (a) is silent with respect to enterprise, and only requires the state to allege specifically "the existence of a pattern of racketeering activity based upon at least two incidents of racketeering activity, which shall be specified in such information . . . ." Tellingly, § 53-396 (a) expressly contemplates that the fact finder may well be exposed to evidence of other criminal activities during a prosecution for racketeering, as it specifically authorizes the state, "where otherwise permitted by law, [to] individually charge in separate counts of the same information or by indictment any offense notwithstanding that such offense may also constitute an incident of racketeering activity specified in the count charging a violation of this chapter." Read in context, the fact that neither subsections (a) nor (b) of § 53-396 mandate special pleading and proof of the enterprise element and specifically contemplate exposure to other aspects of criminal activity during the trial suggests that the legislature did not intend to otherwise limit the proof of the enterprise element solely to that evidence used to prove the predicate incidents of racketeering activity. To hold otherwise would run afoul of the maxim that "[w]e are not permitted to supply statutory language that the legislature may have chosen to omit." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *State Board of Labor Relations*, 296 Conn. 594, 605, 996 A.2d 729 (2010).

"To the extent that any ambiguity remains, the legislative history of [CORA] supports this interpretation." *State* v. *Rodriguez-Roman*, supra, 297 Conn. 78. The legislature contemplated the jury's broad consideration of evidence with respect to the existence of an enterprise. As we noted in *Rodriguez-Roman*, in a memorandum to the Joint Standing Committee on the judiciary, Austin J. McGuigan, the then chief state's attorney, observed that, although "in the ordinary criminal prosecution the admissibility of evidence of other crimes is often severely limited, in the [CORA] prosecution *evidence of criminal activity related to an ongoing enterprise is not only admissible, it is essential*. The act thus provides the jury with an opportunity to see the whole picture of the criminal operation and not merely a part of it." (Emphasis in original; internal quotation marks omitted.) Id., quoting Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1982 Sess., pp. 667–68; see also *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 314, 819 A.2d 260 (2003) ("[T]estimony before legislative committees may be considered in determining the particular problem or issue that the

legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question." [Internal quotation marks omitted.]).

Given the general similarity of the statutes, we previously have found federal case law applying RICO to be instructive in our interpretation and application of CORA. See *State* v. *Rodriguez-Roman*, supra, 297 Conn. 81–83. Under RICO, as under CORA, the pattern and enterprise elements are doctrinally separate, although "the proof used to establish these separate elements may in particular cases coalesce . . . ." *United States* v. *Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981). Although the government may use common evidence to prove the pattern and enterprise elements of RICO, the federal courts have held that the government is not limited to that evidence in establishing the existence of an enterprise and the defendant's participation therein, and that a sufficiency of the evidence review may consider all relevant evidence in the record. We find particularly persuasive the decision of the United States Court of Appeals for the First Circuit in *United States* v. *Connolly*, 341 F.3d 16, 25–26 (1st Cir. 2003), in which the court observed that fourteen predicate acts over more than two decades had been submitted to the jury; of those fourteen, the jury found that nine instances had been proven beyond a reasonable doubt. The court rejected the defendant's reliance on a decade long gap in the predicate acts in support of his argument that the "government had failed to prove 'continuity' in the enterprise, i.e., that the enterprise had functioned as an ongoing organization over the period of time alleged, from September 1975 to September 1998." Id. The court stated that "the government introduced significant evidence of the existence of the enterprise *apart from the specified racketeering acts*," including testimony about incidents of bribery that did "not appear in the alleged racketeering acts." (Emphasis added.) Id., 26. Significantly, the First Circuit emphasized that, "simply because the jury found a specified racketeering act as 'unproven beyond a reasonable doubt' *does not mean that the jury found the evidence relating to that act unpersuasive, in combination with other evidence in the case, on the existence of an* [*association in fact*] *enterprise*. Rather, it may only mean that the government did not prove a requisite element of the underlying crime alleged as a racketeering act." (Emphasis added.) Id. Thus, the "evidence relating to those acts remained available to the jury in its evaluation of the enterprise element of the RICO charge."[12] Id., 27.

Indeed, in *United States* v. *Cianci*, supra, 378 F.3d 90–94, the First Circuit specifically rejected the defen-

dants' argument that express acquittals of predicate offenses on the special verdict form eliminated the associated evidence from the jury's consideration for other RICO purposes. The court observed that "the specific purpose of the special verdict form is to limit the facts found at trial for the purpose of assessing on appeal the sufficiency of the prevailing party's case," and that the "special verdict form allows juries to specifically identify the predicates for the general verdict."[13] Id., 91. In upholding a sufficiency challenge to the enterprise element of a RICO conspiracy charge, the First Circuit held that even the "evidence relating to those [predicate] acts that were found 'unproven' by the jury [with respective to substantive RICO charges] was still available to the jury in its evaluation of the overall RICO charge." Id., 93; see also id. ("though the evidence might not have shown completed commission of the racketeering acts, it could have led the jury to find the requisites of a RICO conspiracy among the defendants to commit the racketeering acts" [emphasis omitted]).

Having considered the relevant statutory language, legislative history, and persuasive federal case law, we conclude that the jury, and a reviewing court, may consider the entire record in determining whether the state has proven the existence of an enterprise, and are not limited to evidence concerning the predicate acts that the jury has found to constitute the pattern of racketeering.[14] Accordingly, the Appellate Court improperly limited its inquiry to evidence concerning the predicate acts in considering whether there was sufficient evidence that an enterprise, in which the defendant participated, existed for purposes of liability under CORA.

### B

Having reviewed the full record in this case, we agree with the defendant that there is insufficient evidence of an enterprise under an association in fact theory, and the defendant's participation in that enterprise, to sustain his conviction for racketeering under § 53-395 (c). In particular, we conclude that the jury could not reasonably have found that the state had proven beyond a reasonable doubt the existence of an association in fact between the defendant and the six other drug dealers who sold narcotics from the porch of his Bridgeport home.[15]

Before turning to a review of the evidence in the present case, we note the following background principles concerning proof of an association in fact enterprise, as defined by § 53-394 (c).[16] Following the United States Supreme Court's interpretation of RICO in *Boyle* v. *United States*, 556 U.S. 938, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009), we held in *Rodriguez-Roman* that "evidence of an ascertainable structure that exists for a purpose [b]eyond that inherent in the pattern of racketeering activity" is not required.[17] (Internal quotation marks omitted.) *State* v. *Rodriguez-Roman*, supra, 297

Conn. 82. Nonetheless, we noted that, consistent with the terms of RICO, an association in fact enterprise must have a structure, which requires proof of: "(1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit the associates to pursue the purpose of the enterprise . . . ." (Citation omitted.) Id.; see *Boyle* v. *United States*, supra, 945–46. "[T]he requirements for proving an association in fact enterprise *do not* include a hierarchical structure, fixed roles for its members, a name, regular meetings, dues, established rules and regulations, disciplinary procedures and induction or initiation ceremonies." (Emphasis added.) *State* v. *Rodriguez-Roman*, supra, 82–83. Rather, an association in fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct that could be proven by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." (Internal quotation marks omitted.) Id., 82; see id., 83–84 (jury reasonably could have found that "the defendant and [the coconspirator] entered into an association during the years 2002 and 2003 for the purpose of issuing fraudulent licenses to illegal immigrants in exchange for a substantial fee," evidenced by well coordinated scheme with distinct roles for each partner that required independent actions for enterprise to succeed); accord *United States* v. *Ramirez-Rivera*, 800 F.3d 1, 19 (1st Cir. 2015) ("[T]he law is clear that the government . . . must prove that the enterprise existed in some coherent and cohesive form. . . . It follows that the enterprise must have been an ongoing organization operating as a continuous unit." [Internal quotation marks omitted.]), cert. denied,      U.S.     , 136 S. Ct. 908, 193 L. Ed. 2d 800 (2016); *United States* v. *Hosseini*, 679 F.3d 544, 558 (7th Cir.) (individuals acting "independently and without coordination" do not constitute enterprise under RICO [emphasis omitted]), cert. denied,      U.S.     , 133 S. Ct. 623, 184 L. Ed. 2d 396 (2012); *United States* v. *Rogers*, 89 F.3d 1326, 1337 (7th Cir.) ("[t]he continuity of an informal enterprise and the differentiation among roles can provide the requisite structure to prove the element of enterprise" [internal quotation marks omitted]), cert. denied, 519 U.S. 999, 117 S. Ct. 495, 136 L. Ed. 2d 387 (1996).

Applying these principles to the record in the present case, we conclude that the evidence of an association in fact enterprise is insufficient to sustain the jury's verdict, even when the evidence is viewed in the light most favorable to the state. We begin our review of the evidence with the June 25, 2010 transaction.[18] Specifically, Hannon went to the corner of Pembroke and Ogden Streets intending to make a controlled narcotics purchase from the defendant. Prior to Hannon's arrival, Detective Jason Amato had observed the defendant standing in front of his house with Moreland and Mathis

and then observed the defendant leaving the area. After Hannon arrived, Moreland informed him that the defendant had gone to the police station to seek victims' compensation for injuries he had sustained in a shooting. Hannon purchased cocaine from Moreland, who had returned to the porch of the defendant's home to obtain it from Mathis. A review of the videotape evidence demonstrates that the porch of the defendant's home, and its short set of access steps, directly abutted the sidewalk on Pembroke Street.

With respect to the June 30, 2010 sale, which the jury found to be one of the two predicate acts in the pattern of racketeering, Hannon called Ortiz, an "associate" of the defendant on Ortiz' mobile phone, looking to purchase drugs. While Hannon was on his way to the corner of Pembroke and Ogden, the defendant called Hannon to ask why he had not yet arrived. When Hannon arrived at that location, he called the defendant to indicate his arrival. Once Hannon arrived at the defendant's home, the defendant gestured to Ortiz and the two of them made the sale to Hannon as described by the Appellate Court. See *State* v. *Bush*, supra, 156 Conn. App. 263–64.

The state also relied on evidence from sales on August 6, 2010, and August 24, 2010. In particular, the August 24, 2010 sale was precipitated by a telephone call from Hannon to the defendant's home phone number, which the defendant had given to Hannon after selling him cocaine on August 6. To complete the August 24, 2010 sale to Hannon, the defendant obtained cocaine from Lopez on his front porch.

Finally, we review the November 9, 2010 sale, which the jury found to be the second predicate act of racketeering. First, Hannon set up the purchase by calling the defendant on the mobile phone number that he previously had used to contact Ortiz,[19] to let him know that he was on the way to meet him. The remainder of the transaction took place as described by the Appellate Court, including the fact that the defendant, upon learning of Hannon's desire to purchase cocaine, called Moreland to obtain the cocaine. The defendant took Hannon's money, and Moreland himself delivered the cocaine to Hannon on Pembroke Street. The defendant later contacted Hannon to confirm that the delivery had occurred, and discussed further Hannon's stated interest in having the defendant help him purchase a gun. See id., 264–65.

We conclude that this evidence was insufficient to prove the association in fact necessary to establish an enterprise for purposes of CORA. Even accepting that the individuals involved shared a common purpose of selling drugs on the eastern side of Bridgeport, there is no evidence that they functioned as a continuing unit or even an informal organization. See *State* v. *Rodriguez-Roman*, supra, 297 Conn. 82. Although the evi-

dence demonstrated that the individuals the defendant permitted to deal drugs from his porch were by no means strangers to him, it does not establish the requisite relationships necessary to sustain a finding of an enterprise. Indeed, it is well short of the evidence that two United States Courts of Appeal have characterized as minimally sufficient to establish the existence of an association in fact under RICO. For example, in *United States* v. *Nascimento*, 491 F.3d 25, 33 (1st Cir. 2007), cert. denied, 552 U.S. 1297, 128 S. Ct. 1738, 170 L. Ed. 2d 543 (2008), the First Circuit deemed the evidence "barely" enough to prove that a street gang constituted a RICO enterprise. Although the defendants in *Nascimento* relied on the testimony of "cooperating witnesses who described [the gang] as a loose aggregation of friends that lacked colors, initiation rites, and a formal hierarchy," the court emphasized that other testimony supported the jury's verdict that the group was an enterprise, including "a shared cache of firearms that were regarded as property of the gang," and used to shoot rivals. Id., 32–33. The court also cited testimony demonstrating that members of the group "self-identified" as being part of the gang, "displayed an ability to distinguish between members and friends," trained each other "in the use of night vision goggles, binoculars, and police evasion tactics to enable them more efficiently to carry out their shared purpose of killing [rival group] members," "kept tabs on one another and informed one another when things would be 'hot' because of a recent shooting," and "acted on behalf of one another by attempting to assassinate witnesses to each other's crimes." Id., 33. The court ultimately concluded that, although the gang "lacked some of the accouterments of more structured street gangs, a rational jury could find that it had a sufficiently well-defined shape to constitute an enterprise in the requisite sense" because it "exhibited group cohesion over time; its membership pooled and shared resources; the individuals involved had a sense of belonging and self-identified as [gang] members; and the group had a well-honed set of goals." Id.

Similarly, in *United States* v. *Burden*, 600 F.3d 204, 214–16 (2d Cir.), cert. denied sub nom. *Buchanan* v. *United States*, 562 U.S. 953, 131 S. Ct. 251, 178 L. Ed. 2d 251 (2010), the United States Court of Appeals for the Second Circuit described the evidence of enterprise as " 'somewhat contradictory' " and having "limitations" given the lack of structure in the narcotics group, but ultimately rejected a sufficiency challenge. The court cited evidence that the organization had "multiple members who joined in the shared purpose of selling drugs and promoting such sales" from one common location, "where they were able to traffic drugs out of the public's eye, stored guns, and planned the violent acts they undertook." Id., 215. The court cited testimony that one member of the group was indeed the " 'master-

mind' " who acted as "the head of the [o]rganization, controlling the flow of cocaine and cocaine base, organizing acts of violence, recruiting members, and directing members' activities." Id. The court also cited testimony from dealers who discussed the organization's narcotics supply chain, and the use of "enforcer[s]" who used violence to retaliate against rival gangs. Id. Finally, the court cited testimony that the enterprise continued while the de facto leader was incarcerated, with shifting roles and responsibilities until his release. Id., 215–16; see also *United States* v. *Payne*, 591 F.3d 46, 60–61 (2d Cir.) (sufficient evidence of enterprise to distribute narcotics in neighborhood, despite lack of hierarchical structure, when individuals acted as " 'street family' " and cooperated with selling drugs at specific locations, protected those spots by use of violence, shared funds and narcotics with each other, and aided each other during periods of incarceration), cert. denied, 562 U.S. 950, 131 S. Ct. 74, 178 L. Ed. 2d 246 (2010); *United States* v. *Crenshaw*, 359 F.3d 977, 991 (8th Cir. 2004) ("[t]he distinct-structure element can be shown by patterns of retaliation and intimidation undertaken to protect and defend the enterprise's business and associates . . . and by regular training, oversight, and coordination of associates" [citation omitted]); *United States* v. *Connolly*, supra, 341 F.3d 27 (The court noted that the defendant and his associates "worked together in an [association in fact] enterprise over a period of almost two decades, joining forces to protect themselves from prosecution and to further other criminal activities—some alleged in the indictment, and others not specifically alleged. There was cohesion in the group over time; the membership shared resources and revenues; there was, in fact, a sense of membership.").

The facts of this case pale in comparison to the federal courts' decisions in *Burden* and *Nascimento*, which we view as illustrative of the baseline level of "ongoing organization" or "function as a continuing unit"; (internal quotation marks omitted) *State* v. *Rodriguez-Roman*, supra, 297 Conn. 82; necessary to establish an association in fact for purposes of CORA.[20] In contrast to those cases, there is no evidence of cooperation among the various alleged participants with respect to protecting the alleged enterprise from competitors[21] or the police; indeed, there was no evidence of weapons seized from the defendant's house or any of the participants.[22] There also is no evidence of common narcotics sourcing at the wholesale or retail level or profit sharing among the various alleged participants beyond the drugs accepted by the defendant for his personal use from individual dealers as a gratuity or tribute after their sales from his porch.[23] Although the evidence demonstrated that the defendant served as a point of customer contact though his home telephone or Ortiz' mobile telephone for those seeking to purchase drugs

from the vicinity of his porch—either sold by himself or obtained from other nearby dealers[24]—there is simply no evidence that demonstrates the minimal level of cohesive organization necessary to sustain a verdict finding the existence of an enterprise that exists to sell narcotics for purposes of criminal liability under CORA.[25] Indeed, the defendant acted alone in making four of the six sales of narcotics of which he was convicted, and, in three of those sales, obtained the narcotics from three different locations away from his home that had no apparent relationship to each other or to the other members of the alleged enterprise. With respect to the two other sales that involved other persons, they involved different persons with no apparent relationship to each other.[26] Put differently, all that the evidence in the present case proves is an aggregation of apparently friendly individuals involved in various narcotics transactions, with no indication of ties to demonstrate a sustained pattern of cooperation among them.[27]

We acknowledge the well established precepts that, in considering the sufficiency of the evidence, "[w]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005). "[O]nce a defendant has been found guilty of the crime charged, a reviewing court conducts its review of all the evidence in the light most favorable to the prosecution. In short, [t]he evidence must be given a construction most favorable to sustaining the jury's verdict." (Internal quotation marks omitted.) Id., 800–801. Nevertheless, upholding the jury's verdict in the present case would mean that virtually any cooperation by a defendant with others in connection with the sale of narcotics would have the impermissible result of turning "garden variety criminal activity undertakings" into racketeering punishable under statutes such as CORA.[28] *Gross* v. *State*, 765 So. 2d 39, 46 n.5 (Fla. 2000), cert. denied, 532 U.S. 948, 121 S. Ct. 1416, 149 L. Ed. 2d 357 (2001); see id. (emphasizing that elements of state racketeering statute render target of racketeering "prosecutions . . . appropriately, the professional or career criminal and not non-racketeers who have committed relatively minor crimes" and that "[s]tate should equally not be able to routinely invoke the [racketeering] statute for prosecuting any ordinary set of crimes"). Accordingly, we conclude that the Appellate Court properly determined that there was insufficient evidence to support the defendant's conviction for racketeering under CORA.[29]

II

We next turn to the state's claim that the Appellate Court improperly concluded that the trial court violated the defendant's sixth amendment right to self-representation by allowing him to elect self-representation, but refusing to grant his request for a continuance to prepare for trial, effectively forcing him to accept representation by an attorney he did not want, namely, assigned counsel, Vicki Hutchinson. *State* v. *Bush*, supra, 156 Conn. App. 271.

The Appellate Court's opinion comprehensively sets forth the following additional relevant facts and procedural history: "On the first day of voir dire, March 12, 2012, the defendant told the court that he and Hutchinson 'don't connect at all,' and that he was 'very uncomfortable' with her. In response, the court told the defendant: 'Sir, this case is over a year old . . . approximately a year old, you were arrested about a year ago, around July. You were brought to this courthouse in July of [2011], you plead[ed] not guilty, and . . . Hutchinson has represented you since then. This is . . . and we're ready to start picking the jury, and this is the first request, [a] request to have someone other than . . . Hutchinson represent yourself. . . . Hutchinson is an extremely well experienced defense attorney, we're going forward with the trial at this time.'

"The next day, March 13, 2012, the defendant again voiced his dissatisfaction with Hutchinson's representation. The defendant also complained that he had not had the opportunity to review with his attorney various documents and videotapes she had procured through discovery. In response, the court reiterated that the defendant's trial had already begun and that Hutchinson was a very experienced attorney. The court explained that the trial would proceed with jury selection that morning, but that the defendant would be given the afternoon to meet with Hutchinson. At that point, the state suggested to the court that the court may have an obligation, pursuant to *State* v. *Flanagan*, 293 Conn. 406, 978 A.2d 64 (2009), to canvass the defendant as to his request to represent himself. The court responded, 'We're not at that point yet.' Voir dire resumed.

"Shortly thereafter, when the defendant interrupted the voir dire proceedings, the court asked him if he wanted to represent himself. When the defendant responded in the affirmative, the court canvassed him both to determine if he had the desire and the capacity to represent himself, and to warn him of the dangers and disadvantages of self-representation. After asking the defendant several questions on these subjects, the court proposed to the defendant that he agree to have Hutchinson pick the jury, and then it would revisit the issue of whether he should be allowed to represent himself going forward. The defendant initially agreed to that proposal. Voir dire thus continued until 1:15 p.m., with Hutchinson still representing the defendant.

Thereafter, as promised, the defendant was afforded the rest of the day to meet with Hutchinson to review the state's disclosure.

"The next day, March 14, 2012, the defendant notified the court that technical difficulties prevented him from being able to watch certain of the videotapes that he had sought to watch on the previous afternoon. Following an exchange with the defendant and a discussion with counsel, the court decided not to proceed with voir dire that day so as to give the defendant another opportunity to view the videotapes that he had not been able to view the day before.

"After the defendant reviewed the videotapes, the court revisited the defendant's request to represent himself, and the defendant reiterated his desire to do so. The court then thoroughly canvassed the defendant and determined that he validly waived his right to counsel. The court asked Hutchinson to remain present as standby counsel for the defendant, and then adjourned for the day.

"On the next day, March 15, 2012, Hutchinson asked the court what she should do with all of the disclosure, approximately 900 pages of documents, that she had received from the state. She asked, more particularly, whether she should turn everything over to the defendant, which would be problematic because there was a protective order in effect that prevented the defendant from bringing those documents back to prison with him because other codefendants were also being held there." *State* v. *Bush*, supra, 156 Conn. App. 271–73. At that point, the defendant asked the court for "time to look over" those documents. (Internal quotation marks omitted.) Id., 273. The trial court denied the defendant's request for additional time, explaining it would not provide a continuance because he had "made the decision to represent [himself] in the middle of a trial." Id., 275. The trial court emphasized that, because trial had begun, it would not have granted a continuance even if the defendant "had hired another lawyer to come in at this moment . . . ." (Internal quotation marks omitted.) Id., 274. The trial court advised the defendant that he would "have time during the trial and after the jury is selected [to review those documents] but at this time we're going to complete the jury selection." (Internal quotation marks omitted.) Id., 275. Hutchinson then suggested that the defendant could be given time to come to court and prepare the next day, when court was not scheduled to be in session, a suggestion with which the defendant disagreed because he claimed to "need to find [his] witnesses." (Internal quotation marks omitted.) Id. Over the defendant's protests, the trial court then proceeded with jury selection.[30] See id., 275–77.

"The jury panel was brought into the courtroom and, as the court began to address the panel, the defendant

stated that he wanted to be taken downstairs. The court admonished the defendant that he would waive his right to represent himself if he refused to participate in the proceedings. The defendant explained that he did not study or practice law and that there were a lot of complicated things that he needed to go through. The defendant repeated that he wanted to go downstairs." Id., 277. At that point, the trial court informed the jury panel that the proceedings would be moved to another courtroom to allow the defendant to "sit in a glassed in room and hear the proceedings" while Hutchinson represented him for purposes of jury selection, as he was waiving his constitutional right to represent himself. (Internal quotation marks omitted.) Id., 277–78. After another discussion about the defendant's desire for a different attorney to replace Hutchinson and whether he intended to participate personally, the trial court moved the proceedings to the courtroom with an observation booth.[31] Id., 278–79.

After a brief recess, the proceedings resumed in the courtroom that had the glass observation booth for the defendant. Id., 279. At that point, the trial court questioned the defendant about a report that he had stated to the marshals that he did not want to sit in the observation room, either. Id. The defendant reiterated that he felt that he was being treated unfairly, and the trial court emphasized that the defendant's only choices were to represent himself or be represented by Hutchinson.[32] Id., 280–81. After the trial court emphasized its desire to assure the defendant a fair trial, Hutchinson interjected and advised the court that she had reviewed the 900 page disclosure, much of which pertained to the charges pending against the other dealers, and "separated the six distinct sale charges against this particular defendant, and they are at the beginning of the books. So, it's maybe fifty pages that pertain to just his six sale charges. And I would suggest that he take those pages out of the binder, and take them back with him to review. And I would also advise the court that whether [he represents himself] or there's an attorney, whoever is defending the case would be looking at these papers all weekend long. And I know the state is concerned about all the other defendants who are in the rest of the book." (Internal quotation marks omitted.) Id., 282. At that point, the defendant stated that he had changed his mind and wanted to be represented by Hutchinson moving forward, and the trial court granted that request after confirming the defendant's desire to elect representation by counsel.[33] Id., 282–83.

The Appellate Court concluded that the trial court's denial of the defendant's request for a continuance to allow him to review the state's "voluminous disclosure" was an abuse of discretion because it effectively denied him his right of self-representation guaranteed by the sixth amendment to the United States constitution under *Faretta* v. *California*, supra, 422 U.S. 806. See

*State* v. *Bush*, supra, 156 Conn. App. 283–89. Specifically, the Appellate Court disagreed with the state's claim that "the defendant reasserted his right to counsel, thus waiving his right to represent himself, following the court's denial of his request for a continuance" because it agreed with the defendant's argument that the trial "court rendered meaningless its prior permission for him to represent himself by denying his request for time to review the state's 900 page disclosure, effectively denying him the opportunity to effectively represent himself." Id., 286; see id., 287–88 (noting that defendant could not bring documents back to prison, and that it was "doubtful that there would have been any meaningful period of time after jury selection and prior to the commencement of the trial when the defendant would have had the opportunity to review the state's disclosure at the courthouse"). The Appellate Court further concluded that this abuse of discretion was structural error entitling the defendant to a new trial because it "effectively undermined his right to self-representation . . . ." Id., 288–89.

On appeal to this court, the state claims that the Appellate Court improperly determined that the trial court had abused its discretion by denying the defendant's request for a continuance, which was an error that had the effect of denying him his right to self-representation. Relying on, for example, *State* v. *Flanagan*, supra, 293 Conn. 406, *Morris* v. *Slappy*, 461 U.S. 1, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983), *United States* v. *Hurtado*, 47 F.3d 577 (2d Cir.), cert. denied, 516 U.S. 903, 116 S. Ct. 266, 133 L. Ed. 2d 188 (1995), and *State* v. *Hamilton*, 228 Conn. 234, 636 A.2d 760 (1994), the state contends that the defendant's right to elect self-representation is " 'sharply curtailed' " once trial begins with jury selection, and the trial court retains the discretion to balance it against the orderly administration of justice in determining whether a continuance is appropriate. The state argues that the Appellate Court's conclusion that "Thursday night, Friday, Saturday, and Sunday was an inadequate amount of time for the defendant to meaningfully review the state's disclosure," was inaccurate, particularly given Hutchinson's representation to the trial court that "she had culled the most important documents" from the original disclosure, rendering adequate time on Friday for the defendant's review. The state further emphasizes that the defendant's request for a continuance came after some jurors had already been selected based on their availability given the communicated expectation that the court would start taking evidence on the following Monday. Thus, the state contends that, because the trial court did not abuse its discretion in denying a continuance, the defendant's ultimate decision to proceed with counsel, even if influenced by the denial of the continuance, was a voluntary waiver of his right to self-representation.

In response, the defendant relies on several cases from the United States Court of Appeals for the Ninth Circuit, namely, *United States* v. *Farias*, 618 F.3d 1049 (9th Cir. 2010), *United States* v. *Royal*, 43 Fed. Appx. 42 (9th Cir. 2002) (unpublished opinion), and *Armant* v. *Marquez*, 772 F.2d 552 (9th Cir. 1985), cert. denied sub nom. *Bunnell* v. *Armant*, 475 U.S. 1099, 106 S. Ct. 1502, 89 L. Ed. 2d 902 (1986), in support of his contention that the Appellate Court properly determined that the trial court's refusal to grant his request for a continuance violated his right of self-representation because it left him unable to prepare, thus, "effectively depriv[ing] [him] of his right to self-representation." The defendant argues that a continuance was necessary because: (1) the record demonstrates that he had never seen the records disclosed by the state and the protective order precluded him from bringing those records back to prison to prepare over the weekend; (2) he needed time to locate witnesses whom Hutchinson did not want to present; and (3) he had not had the opportunity to review the audiotape and videotape evidence while incarcerated awaiting trial. Thus, the defendant contends that the Appellate Court properly determined that the trial court's "insist[ence] that the trial go forward even though [he] was unprepared and would not have time to effectively prepare" constituted a forced waiver of his right to self-representation, which was a structural error requiring a new trial. We, however, agree with the state, and conclude that the Appellate Court improperly determined that the trial court abused its discretion by denying the defendant's request for a continuance, thus, effectively depriving him of his right to self-representation.

This "case involves the intersection of principles involving the right to self-representation and the discretionary authority of the trial court in managing trial schedules." *Commonwealth* v. *Brooks*, 628 Pa. 524, 526, 104 A.3d 466 (2014). As the United States Supreme Court has explained, "[t]rial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances . . . ." *Morris* v. *Slappy*, supra, 461 U.S. 11.

Thus, the "determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Hamilton*, supra, 228 Conn. 239. "A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must

show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. . . .

"In appellate review of matters of continuances, federal and state courts have identified multiple factors that appropriately may enter into the trial court's exercise of its discretion. Although the applicable factors cannot be exhaustively catalogued, they generally fall into two categories. One set of factors focuses on the facts of record before the trial court at the time when it rendered its decision. From this perspective, courts have considered matters such as: the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the defendant's personal responsibility for the timing of the request; the likelihood that the denial would substantially impair the defendant's ability to defend himself; the availability of other, adequately equipped and prepared counsel to try the case; and the adequacy of the representation already being afforded to the defendant. . . . Another set of factors has included, as part of the inquiry into a possible abuse of discretion, a consideration of the prejudice that the defendant actually suffered by reason of the denial of the motion for continuance." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 240–41.

A trial court's discretion with respect to trial scheduling may well be tempered by the right to counsel under the sixth amendment to the United States constitution, which also affords "a defendant in a state criminal trial . . . [a] right to proceed without counsel when he voluntarily and intelligently elects to do so." (Emphasis omitted.) *Faretta* v. *California*, supra, 422 U.S. 807. "This court consistently has recognized the inviolability of the right of self-representation . . . and that the right is also consistent with the ideal of due process as an expression of fundamental fairness. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. . . . The right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently

waiving his right to representation by counsel." (Citations omitted; internal quotation marks omitted.) *State* v. *Flanagan*, supra, 293 Conn. 418. Upon a "clear and unequivocal" request, the trial court must canvass the defendant in accordance with Practice Book § 44-3, which "implement[s] the right of a defendant in a criminal case to act as his own attorney" and aids the court in determining "the defendant's decision to waive counsel is knowingly and intelligently made." (Internal quotation marks omitted.) Id., 419–20.

Continuances and the right to self-representation relate because, as a general proposition, a "criminal defendant does not simply have the right to represent himself, but rather has the right to represent himself meaningfully. Meaningful representation requires time to prepare." *United States* v. *Farias*, supra, 618 F.3d 1053. Reasonable continuances may well be required to allow that preparation to occur. See id., 1054–55. Indeed, consistent with the Appellate Court's ultimate conclusion in this case; see *State* v. *Bush*, supra, 156 Conn. App. 288–89; an abuse of discretion in denying such a continuance may "effectively" deprive the defendant of his right of self-representation, thus, requiring a new trial. See *United States* v. *Farias*, supra, 1054; *Barham* v. *Powell*, 895 F.2d 19, 22 (1st Cir.), cert. denied, 495 U.S. 961, 110 S. Ct. 2572, 109 L. Ed. 2d 754 (1990); *Armant* v. *Marquez*, supra, 772 F.2d 557–58; accord *State* v. *Hamilton*, supra, 228 Conn. 249 (denial of continuance may deprive defendant of due process rights or sixth amendment right to counsel of choice "if a defendant is arbitrarily deprived of a fair opportunity and reasonable time to employ counsel of the defendant's own choosing").

The right of self-representation is not, however, unfettered. With respect to disruption of the proceedings, the court may deny a defendant the right of self-representation if the request is "untimely."[34] (Internal quotation marks omitted.) *State* v. *Flanagan*, supra, 293 Conn. 431. A "criminal defendant must make a timely and unequivocal request to proceed pro se in order to ensure the orderly administration of justice and prevent the disruption of both the [pretrial] proceedings and a criminal trial. . . . Assuming, however, that a defendant's request to proceed pro se is informed, voluntary and unequivocal, [t]he right of a defendant in a criminal case to act as his own lawyer is unqualified if invoked prior to the start of the trial. . . . Distinct considerations bear upon requests made after a trial has begun. . . . *After the commencement of a trial, the right of self-representation is sharply curtailed . . . and a trial court faced with such an application must balance the legitimate interests of the defendant in self-representation against the potential disruption of the proceedings* already in progress."[35] (Citations omitted; emphasis altered; internal quotation marks omitted.) Id. "Trial commences, for this purpose, at voir dire."

(Internal quotation marks omitted.) *State* v. *Pires*, 310 Conn. 222, 252, 77 A.3d 87 (2013). "Trial courts' decisions to deny requests for self-representation that are made after the commencement of trial are reviewed for abuse of discretion." Id., 253.

After trial commences, consistent with the defendant's " 'sharply curtailed' " freedom to elect self-representation; *State* v. *Flanagan*, supra, 293 Conn. 431; the trial court's obligation to afford a self-represented defendant a continuance for purposes of meaningful preparation is similarly diminished, given the trial court's prerogative to manage the trial in light of the schedules of the court, witnesses, counsel and the jury. See, e.g., *Morris* v. *Slappy*, supra, 461 U.S. 11–12; *State* v. *Hamilton*, supra, 228 Conn. 239–41; see also *Commonwealth* v. *Brooks*, supra, 628 Pa. 538–39 (emphasizing that "right to self-representation . . . is not absolute" and that "this appeal is not simply about the right to self-representation; it also involves the timing of such requests, and the trial court's authority to manage its docket and trial schedule" because "defendants should not be permitted to unreasonably clog the machinery of justice, or hamper and delay the effort to administer justice effectively" via assertion of right of self-representation [internal quotation marks omitted]). Thus, once trial commences, a trial court is not obligated to delay the proceedings in order to enable or facilitate a belated request for self-representation. See *People* v. *Jenkins*, 22 Cal. 4th 900, 1039, 997 P.2d 1044, 95 Cal. Rptr. 2d 377 (2000) ("in ruling on [the] defendant's midtrial motion to represent himself, the court correctly noted that it had authority to deny the motion if self-representation required a continuance, and, in advising the defendant of the perils of self-representation, it asked [the] defendant whether he understood, among other things, that he would receive 'no extra time for preparation' "), cert. denied, 531 U.S. 1155, 121 S. Ct. 1104, 148 L. Ed. 2d 975 (2001); *Commonwealth* v. *Brooks*, supra, 538, 545 (trial court did not abuse discretion in denying request for continuance made on first day of jury selection because right to self-representation "is not absolute" and, insofar as "disruptive behavior might affect a trial judge's exercise of discretion" the "lateness of a continuance request itself can be disruptive"). Put differently, granting a late request for permission to proceed as a self-represented party, while denying a continuance for preparation, does *not* necessarily present the defendant with "a Hobson's choice between either proceeding with appointed counsel or representing himself with no time to prepare such representation," as "this predicament was a product of [his] own making."[36] *United States* v. *Wright*, 682 F.3d 1088, 1090 (8th Cir. 2012).

In particular, a denial of a continuance to enable a midtrial election of self-representation is not an abuse of discretion if the trial court has thoughtfully consid-

ered the status of the case and otherwise made reasonable efforts to accommodate the needs of the defendant, such as the provision of standby counsel or breaks during the scheduled trial itself. For example, in *United States* v. *Hurtado*, supra, 47 F.3d 584, the Second Circuit rejected a claim that "the district court failed to afford [the defendant] enough time to prepare his case once he chose to represent himself" by giving him "more time to review certain documents that he claimed he had not received previously." The court emphasized that the defendant was advised he would be expected "to adhere to the same standards as any attorney" and materials had been in possession of defense counsel for an adequate period of time, and that the defendant had in fact received time during trial to review documents, notwithstanding the denial of the continuances. Id.; see also *Commonwealth* v. *Brooks*, supra, 628 Pa. 538–44 (trial judge did not abuse discretion by denying continuance request made on day scheduled for jury selection to enable defendant to represent himself given disruption of schedule and assurances from defense counsel that he had conferred with defendant about strategy, and was personally well prepared).[37]

Having reviewed the record in this case in light of these principles, along with the guiding factors of *State* v. *Hamilton*, supra, 228 Conn. 239–41, we conclude that the trial court did not abuse its discretion in denying the defendant's request for an apparently indefinite continuance in order to review the state's disclosure. It is significant that the defendant, who had elected self-represented status after trial started, did not request a continuance until three jurors had been selected, and the trial court had already informed those jurors and other venirepersons of the trial schedule. Moreover, the trial court reasonably relied on the representation of Hutchinson, who was prepared for trial and whom the court had appointed as standby counsel after the defendant elected to proceed as a self-represented party, that she had culled the most important documents from the 900 page disclosure for the defendant's review, in order to assist with the preparation over the several days between jury selection and the anticipated start of evidence.[38] Further, in declining to grant the defendant's request for preparation time, the trial court aptly observed, consistent with the balancing test of *State* v. *Flanagan*, supra, 293 Conn. 431–33, which is applicable to midtrial requests, that self-representation was not in the defendant's best interests given Hutchinson's competence and experience, along with the complexity of the case. See *State* v. *Pires*, supra, 310 Conn. 253–55 (trial court did not abuse discretion in denying request for self-representation made at sentencing because it observed, inter alia, that appointed counsel did "fantastic legal work," and delay of sentencing to allow self-representation would not "be beneficial either to you and, or, to the family of the victims in this case and,

or, to the judicial process" [emphasis omitted; internal quotation marks omitted]); *State* v. *Silva*, 166 Conn. App. 255, 275–76, 141 A.3d 916 (2016) (trial court did not abuse discretion in denying midtrial motion for self-representation, even when defendant did not request delay, because it "determined that the defendant's reasons for wanting to represent himself would ultimately waste the court's time and be prejudicial to the defendant"). Indeed, the potentially disruptive nature of the defendant's request for a continuance was further established by his own behavior, insofar as he had refused to participate in the proceedings after electing to proceed as a self-represented party—to the point that the proceedings were moved to a different courtroom and required the active participation of Hutchinson as standby counsel.

In reviewing the trial court's denial of the defendant's request for a continuance, we are mindful that "the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. Our role as an appellate court is not to substitute our judgment for that of a trial court that has chosen one of many reasonable alternatives." *State* v. *Hamilton*, supra, 228 Conn. 250. When the delay inherent in an apparently indefinite continuance is considered in juxtaposition with the sharply curtailed right of self-representation following the commencement of trial, we conclude that the Appellate Court improperly determined that the record in the present case indicates that the trial court had abused its discretion by denying the defendant's request for a continuance. The Appellate Court, therefore, improperly held that the defendant was entitled to a new trial because the trial court's denial of a continuance effectively deprived him of his right to self-representation.

The judgment of the Appellate Court is affirmed with respect to the defendant's conviction of racketeering. The judgment of the Appellate Court is reversed with respect to the defendant's motion for continuance and the case is remanded to that court with direction to consider the defendant's remaining claims on appeal.

In this opinion ROGERS, C. J., and PALMER and McDONALD, Js., concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, McDonald and Robinson. Thereafter, Justice Zarella retired from this court and did not participate in the consideration of the case. Although Justice Palmer was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

[1] General Statutes § 53-396 (b) provides: "In any prosecution under this chapter the court or the jury, as the case may be, shall indicate by special verdict the particular incidents of racketeering activity that it finds to have been proved by the state beyond a reasonable doubt."

[2] We granted the state's petition for certification to appeal limited to the following issues: (1) "Did the Appellate Court properly conclude that the state failed to adduce sufficient evidence to convict the defendant of a violation of General Statutes § 53-395 (c)?"; and (2) "Did the Appellate

Court properly conclude that the trial court violated the self-represented defendant's sixth amendment right to self-representation by denying his request for a reasonable continuance to review his attorney's case before the start of evidence at trial?" *State* v. *Bush*, 317 Conn. 903, 903–904, 114 A.3d 1219 (2015).

[3] General Statutes § 53-395 (c) provides: "It is unlawful for any person employed by, or associated with, any enterprise to knowingly conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity or through the collection of an unlawful debt."

[4] We note that the state did not specifically allege in the operative information that Brazil, Jamison, and Lopez had participated in any of the narcotics sales of which the defendant was convicted, including those alleged as predicate acts for the racketeering charge. Jamison and Lopez were, however, specifically alleged to be coconspirators for purposes of the conspiracy count. The evidence adduced at trial, discussed in detail in part I of this opinion, demonstrates that Brazil and Lopez had some involvement in the narcotics sales of which the defendant was convicted.

[5] Beyond the issues discussed in this certified appeal, the defendant also claimed before the Appellate Court that the trial court: (1) violated the defendant's right of self-representation by ignoring his first request, and subsequently denying his second request without conducting a full canvass; (2) improperly instructed the jury on the elements of racketeering; (3) improperly instructed the jury with respect to conspiracy; and (4) imposed an illegal sentence for conspiracy, given the acquittal of the underlying crime of sale of narcotics by a person who is not drug-dependent.

Subsequent to our grant of certification to appeal, the defendant filed a statement pursuant to Practice Book § 84-11 (a) raising these claims as alternative grounds for affirming the judgment of the Appellate Court. We subsequently denied the state's motion to strike this statement of alternative grounds. Because the defendant has not, however, included any analysis of these issues in his brief in this certified appeal, we decline to consider them further, leaving them to the Appellate Court to consider in the first instance on remand.

[6] As the Appellate Court noted, the "jury was provided with a verdict form to complete and submit to the court upon rendering its verdict. The form first asks whether the jury finds the defendant guilty or not guilty of the racketeering charge. It then goes on to direct the jury, if it finds the defendant guilty, to indicate *which two or more incidents of racketeering activity that you have found beyond a reasonable doubt were committed by the defendant* . . . . The form lists the dates of the seven alleged cocaine sales in connection with which the defendant was charged, with a blank line next to each date on which the jury was to place a check mark if it determined that that alleged sale, if committed by the defendant, constituted an incident of racketeering activity. The jury submitted the completed form to the court, indicating that it found the defendant guilty of racketeering based upon the following incidents of racketeering activity:

"1. Sale of cocaine on June 25, 2010 _____
"2. Sale of cocaine on June 30, 2010 ___X___
"3. Sale of cocaine on July 14, 2010 _____
"4. Sale of cocaine on July 16, 2010 _____
"5. Sale of cocaine on August 6, 2010 _____
"6. Sale of cocaine on August 24, 2010 _____
"7. Sale of cocaine on November 9, 2010___X___" (Emphasis added; internal quotation marks omitted.) *State* v. *Bush*, supra, 156 Conn. App. 263 n.4.

[7] "Detective Jason Amato testified that drug dealers routinely keep contraband in their mouths." *State* v. *Bush*, supra, 156 Conn. App. 264 n.5.

[8] "There is no claim that the transaction with this other man was part of the pattern of racketeering activity charged in this case." *State* v. *Bush*, supra, 156 Conn. App. 264 n.6.

[9] The Appellate Court further rejected the use of a "hub and spokes" theory to prove the enterprise, observing that "there is no evidence that the defendant's consummation of either sale with one confederate present and assisting him involved, much less required, the collaboration or cooperation of any other confederate, or relied on or benefitted from the actions of the other confederate in any way." *State* v. *Bush*, supra, 156 Conn. App. 270; see also footnote 15 of this opinion.

[10] We note that General Statutes § 53-394 (a) also provides in relevant part that " '[r]acketeering activity' means to commit, to attempt to commit, to conspire to commit, or to intentionally aid, solicit, coerce or intimidate

another person to commit any crime which, at the time of its commission, was a felony chargeable by indictment or information under the following provisions of the general statutes then applicable . . . (16) sections 21a-277, 21a-278 and 21a-279, relating to drugs . . . ."

[11] Although the state discussed the other elements of the racketeering charge during its oral argument before this court, we note the briefs and the defendant's oral argument establish that only the sufficiency of the evidence of the enterprise element is at issue in this certified appeal.

[12] We note that other federal court decisions are consistent with *United States* v. *Connolly*, supra, 341 F.3d 26–27, and permit the jury to consider a broad array of evidence beyond the proven predicate acts in determining whether the government has established the existence of an enterprise under RICO. See *United States* v. *Starrett*, 55 F.3d 1525, 1546 (11th Cir. 1995) (rejecting sufficiency challenge to enterprise element under RICO because "the jury was neither limited to a consideration of the [particular] predicate acts" nor to "any or all of the predicate acts in general" in determining whether defendant "participated in the operation or management" of gang, specifically noting that "[t]he jury was entitled to consider in its entirety *all circumstantial evidence*" of defendant's participation [emphasis added]), cert. denied sub nom. *Sears* v. *United States*, 517 U.S. 1111, 116 S. Ct. 1335, 134 L. Ed. 2d 485 (1996); *United States* v. *DiNome*, 954 F.2d 839, 843–44 (2d Cir.) (rejecting claim of " 'spillover' prejudice" because, under RICO, "evidence of violent activities engaged in by other members and associates" was relevant to establish "the existence and nature of the RICO enterprise"), cert. denied sub nom. *Testa* v. *United States*, 506 U.S. 830, 113 S. Ct. 94, 121 L. Ed. 2d 56 (1992); *United States* v. *Lemm*, 680 F.2d 1193, 1200–1201 (8th Cir. 1982) (analyzing sufficiency claim by eliminating predicate acts, to show that evidence independently demonstrated existence of enterprise in holding that "the enterprise alleged by the government has not been impermissibly equated with the predicate acts of racketeering"), cert. denied, 459 U.S. 1110, 103 S. Ct. 739, 74 L. Ed. 2d 960 (1983).

[13] As the defendant observes, a special verdict is an appropriate device for discerning or limiting the factual basis for a jury's verdict, and a sufficiency of the evidence analysis may well be cabined by facts found in accordance with that special verdict. See, e.g., *United States* v. *Cianci*, supra, 378 F.3d 91; *State* v. *Anderson*, supra, 86 Conn. App. 864; see also *State* v. *Wassil*, supra, 233 Conn. 179–82 (reviewing manslaughter conviction in accordance with theory of liability stated by jury in special verdict). This, however, begs the question in this appeal, namely, the scope of the special verdict. In the present case, the jury's verdict as to CORA was a general one, with only the acts constituting the pattern of racketeering being found specifically, as is required by § 53-396 (b). Neither the jury instruction nor the special verdict form restricted the jury's inquiry or required specification of its findings with respect to the enterprise element of racketeering under CORA. See footnote 6 of this opinion. Thus, the special verdict itself does not limit our inquiry in determining whether there is sufficient evidence to satisfy the enterprise element. See *State* v. *Anderson*, supra, 862–63.

[14] We note that the defendant relies on the Florida District Court of Appeal's decision in *Sanchez* v. *State*, supra, 89 So. 3d 912, for the proposition that the Appellate Court properly limited its inquiry to the predicate offenses specified in the special verdict in determining that the evidence was insufficient to sustain the racketeering conviction under CORA. *Sanchez* is distinguishable because the sufficiency analysis in that case did not concern the enterprise element. See id., 916. Instead, in reversing a substantive racketeering conviction, the court concluded that there was insufficient evidence to support one of the only two predicate acts specified by the jury in its special verdict. Id., 917; see also id., 915–16 (concluding that there was insufficient evidence that defendant had knowingly aided in escape of prisoner).

[15] Given our conclusion that the entirety of the record may be considered in determining whether the state proved the existence of an enterprise, we need not consider the state's arguments with respect to whether the Appellate Court, relying heavily on a decision analyzing RICO, *New York* v. *Chavez*, 944 F. Supp. 2d 260, 272 (S.D.N.Y. 2013), properly determined that a "hub and spokes" relationship is not sufficient to create an enterprise under CORA. See *State* v. *Bush*, supra, 156 Conn. App. 267–70; see also footnote 9 of this opinion. We note that there is some division in the federal courts on this point with respect to their interpretation of RICO in the wake of *Boyle* v. *United States*, 556 U.S. 938, 948–51, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009), although the Appellate Court's conclusion in the present case

is consistent with the majority view. See *Gucci America, Inc.* v. *Alibaba Group Holding Ltd.*, Docket No. 15-CV-3784 (PKC), 2016 WL 6110565, *5–6 (S.D.N.Y. August 4, 2016).

[16] Although an individual theoretically may be an enterprise under CORA; see General Statutes § 53-394 (c); we note that the state does not claim that the defendant in this case was himself the enterprise. Indeed, consistent with RICO case law interpreting § 1961 (4) of title 18 of the United States Code, in particular *Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158, 161–63, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001), it would appear that the defendant and the individual constituting the enterprise must be different entities for liability to attach under CORA. See, e.g., *Ray* v. *Spirit Airlines, Inc.*, 836 F.3d 1340, 1355 (11th Cir. 2016); *Cruz* v. *FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013).

[17] Under RICO, "[a]s the Supreme Court indicated in [*United States* v. *Turkette*, supra, 452 U.S. 583], the government is required to prove both the existence of an enterprise and a pattern of racketeering activity. The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The enterprise is not the pattern of racketeering activity; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the [g]overnment." (Internal quotation marks omitted.) *United States* v. *Connolly*, supra, 341 F.3d 25.

[18] Although the jury acquitted the defendant of the narcotics sale charges arising from June 25, 2010 as noted in part I A of this opinion, the evidence relating to the June 25, 2010 transaction is relevant to prove the existence of an enterprise for purposes of CORA.

[19] The defendant testified that he was given the mobile phone by a female associate of Ortiz after Ortiz had been arrested.

[20] Other recent federal decisions under RICO are illustrative of more sophisticated narcotics dealing enterprises than those considered in *Burden* and *Nascimento*, involving groups with formal colors or insignias, a hierarchical structure of rank within the group, and designated territories enforced with violence. See, e.g., *United States* v. *Ramirez-Rivera*, supra, 800 F.3d 19 (gang had name, rules and structure, gang sign via unique hand gesture, and was combination following truce between two other housing project gangs for purposes of selling drugs and eliminating competition); *United States* v. *Pierce*, 785 F.3d 832, 838–39 (2d Cir.) (gang members had "tattoos and signs that signified their membership," and committed numerous crimes, including three murders, in furtherance of enterprise of selling narcotics in vicinity of housing project), cert. denied,      U.S.    , 136 S. Ct. 172, 193 L. Ed. 2d 139 (2015); *United States* v. *Applins*, 637 F.3d 59, 77–78 (2d Cir. 2011) (gang was enterprise for purpose of selling narcotics when evidence showed that members "congregated daily in their territory, marked their territory with graffiti, received tattoos signifying their membership in the gang," flashed the gang's "hand sign in public places to 'represent' that they were members," used violence to protect specific territory for drug sales, and shared profits for purposes of purchasing supply, along with evidence that gang's structure included " 'senior' " members who provided mentoring and financial assistance).

[21] The state also relies on the fact that the defendant, Ortiz and Moreland "sold cocaine from a single location" to contend that, "because drug dealers do not willingly compromise their profits and security by sharing a single location with other, unaffiliated dealers, the jury reasonably could have inferred the defendant, Ortiz and Moreland were associates." The state relies by analogy on *United States* v. *Cruz-Valdez*, 773 F.2d 1541, 1547 (11th Cir. 1985) (en banc), which stated that common sense supported a jury's conclusion that, "in the course of transporting or distributing millions of dollars worth of readily marketable marijuana, through channels that wholly lack the ordinary protections of organized society, a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders." Even assuming that expert testimony—not present in this record—is not required on this point, the state's argument falls short given Detective Amato's testimony

about the heavy amounts of narcotics trafficking in the immediate area, with no evidence that the members of the alleged enterprise made any plans or took action to secure its turf in the market.

[22] The dissenting justice relies on the defendant's July 14 admonition to Hannon, who at the time ironically was accompanied by undercover police detective Dennis Sang, not to bring the police near his house, as evidence of protective measures. This admonition—common sense for those engaged in the sale of narcotics—does not rise to the level of protective measures that the courts in *Burden* and *Nascimento* deemed indicative of an ongoing enterprise, including caches of weapons.

[23] We disagree with the state's reliance on the lingo used to describe the quantities of cocaine purchased, as well as the packaging of that cocaine and the fact that the dealers concealed those packages in their mouths, as evidence of the enterprise. Given the lack of evidence that this lingo and packaging were unique to the sales conducted from the defendant's porch, and Detective Amato's testimony that they were in fact common to the narcotics trade in the east side of Bridgeport as a whole, we agree with the defendant that this evidence was not probative of the existence of an enterprise.

[24] The dissenting justice suggests that the defendant exercised "direction and control" over the other drug dealers, as evinced by his use of hand signals to communicate with Ortiz during the June 30 sale. The dissent also stated that the defendant "set the ground rules for participating on the porch by stating that no one informs on anyone else and instructed the members not to bring the police." We respectfully disagree. Although the hand signals suggest some cooperative effort between the men, such as making sure the coast was clear, they do not by themselves suggest that the defendant had a leadership role in an organized enterprise. Further, the dissent cites no evidence that the defendant admonished the other dealers, but rather, only the buyer, Hannon.

[25] With respect to the third element, namely, "longevity sufficient to permit the associates to pursue the purpose of the enterprise"; (internal quotation marks omitted) *State* v. *Rodriguez-Roman*, supra, 297 Conn. 82; we note that the defendant does not claim that the period of time at issue in this case, which spans multiple months, is insufficient as a matter of law. See *United States* v. *Pierce*, 785 F.3d 832, 838 (2d Cir.) ("[T]here is no hard-and-fast time period for satisfaction of the longevity prong. Continuity is both a closed-[ended] and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." [Internal quotation marks omitted.]), cert. denied,     U.S.     , 136 S. Ct. 172, 193 L. Ed. 2d 139 (2015); see also *Caro-Bonet* v. *Lotus Management*, *LLC*, United States District Court, Docket No. CV 15-2106 (FAB) (D.P.R. July 5, 2016) (seven months sufficient longevity to establish enterprise under RICO). Rather, we understand the defendant to claim that there is insufficient evidence that the various individuals involved in the present case had relationships with each other in furtherance of a common purpose over the time period involved.

[26] We surmise that this fact led to the Appellate Court's analysis of the enterprise issue under a hub and spoke theory. See footnote 15 of this opinion.

[27] We note, however, that *Jackson* v. *State*, 858 So. 2d 1211 (Fla. App. 2003) (per curiam), on which the defendant relies, is distinguishable. In *Jackson*, Florida's intermediate appellate court concluded that there was insufficient evidence to prove the state's allegation that "the defendant was employed by or associated with a criminal street gang." Id., 1212. The court observed in *Jackson* that "[t]here was no evidence that he was a member of either gang; that he engaged in transactions with or on behalf of gang members; or that he shared any of his drug proceeds with the gangs. Rather, the evidence showed only that [the] defendant sold cocaine in the park and that he was familiar with some other persons who were gang members." Id. We view *Jackson* as distinguishable because that case did not turn on whether one of the two street gangs involved was an enterprise, indeed one was the Latin Kings, but rather, whether the defendant in that case had engaged in activities sufficiently associated with the gangs to render him part of their enterprises. In the present case, the other persons with whom the defendant was associating bore none of the usual hallmarks of a criminal street gang.

[28] The dissenting justice "conclude[s] that conducting such an operation with a group of six other drug dealers on the porch of a private home or adjoining public streets, and dispensing drugs to people stopping in front

of the porch as if it were a drive-through window at a twenty-four hour pharmacy, is the very type of activity that CORA was intended to punish." We respectfully disagree. CORA need not stretch this far to ensure that the defendant receives significant punishment for his contributions to the narcotics trade in Bridgeport, given sentencing options available for his multiple narcotics and conspiracy convictions under §§ 21a-277 (a), 21a-278a (b), and 53a-48.

[29] Although we do not consider the defendant's challenge to the jury instructions on CORA in this certified appeal; see footnotes 2 and 5 of this opinion; we note that greater elaboration on the meaning of the term "enterprise," and in particular the significance of its structure element, might well have aided the jury in divining the difference between racketeering and ordinary criminal activity. Accordingly, we commend this topic to the Judicial Branch Criminal Jury Instruction Committee for their able consideration.

[30] The following colloquy ensued:

"The Defendant: Your Honor, I really feel like you're putting too much pressure on me right now, man, you know what I'm sayin'? Because I explained to you from day one that, you understand, I don't have full knowledge, full understanding of all this. Now you puttin' everything at me at once, Your Honor, you understand what I'm sayin', and you're trying to make me go, you understand what I'm sayin', on things I don't have no nature about . . . that I have to talk to people to get a better understandin' . . . you understand. I don't have a problem with you know, addressin'—

"The Court: Sir, I'm not making, you are electing to represent yourself, so you know—

"The Defendant: And I'm asking—

"The Court: —this is your choice.

"The Defendant: You're denying me all my rights though, Your Honor. I mean, I think I have a right, you understand what I'm saying, to defend myself properly, man. I mean, I can't just do something here that's, you know, unpredictable.

"The Court: Sir, you've decided—

"The Defendant: So what you basically telling me, Your Honor, is you don't care. And I'm . . . I mean, I'm very uncomfortable with that.

"The Court: Well, I care very much sir, but you—

"The Defendant: That's what I'm saying, then show me that you care, Your Honor.

"The Court: Sir, you've elected to represent yourself.

"The Defendant: Because—

"The Court: This is your choice.

"The Defendant: Because—

"The Court: We're not arguing the point.

"The Defendant: I'm not arguing, Your Honor.

"The Court: We're—

"The Defendant: I'm talking to you.

"The Court: We're going forward with the jury selection. This is what you have elected to do. I suggested before that you let counsel select the jury, but you did not want to do that.

"The Defendant: Yeah, but you're rushing me to do something, Your Honor, you're rushing me to do—I'm asking you for time to go over things. You're denying me time, you understand what I'm saying? I mean how am I gonna defend myself properly?

"The Court: Well, sir—

"The Defendant: You understand what I'm saying, if I don't understand something?

"The Court: Sir, we're going forward with the jury selection." (Internal quotation marks omitted.) *State* v. *Bush*, supra, 156 Conn. App. 275–77.

[31] The following colloquy took place before the trial court changed courtrooms:

"The Court: Now, courtroom 3A is available at this moment . . . so we will proceed today in that courtroom. And Mr. Bush, if you elect to sit outside the courtroom, then you have elected to give up your right to—

"The Defendant: I'm not giving up no right.

"The Court: —represent yourself. Sir, you can't—

"The Defendant: I'm not giving up my rights.

"The Court: —have it both ways. You can't make a mockery of the situation, so—

"The Defendant: I'm not trying to make a mockery of it.

"The Court: Mr. Bush, do you want to be in the courtroom, yes or no?

"The Defendant: I want proper—

"The Court: Do you want to be in a courtroom?

"The Defendant: You're asking me what I want, Your Honor, I'm trying to explain to you what I want.

"The Court: Okay, 3A and please bring Mr. Bush down to the glassed in anteroom in 3A—

"The Defendant: If I'm innocent until proven guilty, Your Honor, please, man—

"The Court: And then we'll proceed down in that courtroom.

"The Defendant: I'm asking for proper counsel.

"The Marshal: Yes, Your Honor.

"The Court: Okay, we'll stand in recess." (Internal quotation marks omitted.) *State* v. *Bush*, supra, 156 Conn. App. 278–79.

[32] The record reveals the following colloquy on this point:

"The Defendant: . . . Why would I be sittin' around watchin' something go down that, you know what I'm sayin', yo? I feel like I'm not being treated fairly, man.

"The Court: You have the right to represent yourself, if that's what you want to do. We've gone through that.

"The Defendant: This . . . like I explained to you before—

"The Court: Now, sir—

"The Defendant: —I don't want to represent myself. I want the proper representation, man.

"The Court: No, no, you told me you wanted to represent yourself. If you—

"The Defendant: That's not what I told you.

"The Court: If you don't want to represent yourself then Attorney Hutchinson—

"The Defendant: No—

"The Court: —will stand forward—

"The Defendant: —she's not helping me, Your Honor. Please understand, she's not helping me.

"The Court: Sir, you—

"The Defendant: She haven't been helping me from day one.

"The Court: Sir, you're not getting a different attorney. So, either your election is to go forward with Attorney Hutchinson, we've gone through this, or to represent yourself. Which do you want to do? There's not a third choice at this time. What do you want to do, sir?

"The Defendant: Do what you gotta do, lock me up, Your Honor, if that's what you wanna do. Put me in jail, I mean you know what I'm sayin', yo? But, I feel like I deserve the proper—

"The Court: Sir—

"The Defendant: You understand what I'm sayin', yo? To be treated, you know, fairly. I'm innocent until proven guilty, Your Honor. You understand? Nine tenths of the law. There is nothing in here, nothing in here stating this case, Your Honor. You understand what I'm sayin'? I'm not a gang member. . . .

"The Court: . . . Now the choice is representing yourself or having Attorney Hutchinson represent you.

"The Defendant: Like I explained to you, and I'm going to explain to you—

"The Court: There's . . . I've explained to you there's not a third—

"The Defendant: I like Mrs. Hutchinson.

"The Court: There's not a third—

"The Defendant: I don't have a problem with her, but listen, me and her don't click. . . . That's oil and water right there, Your Honor.

"The Court: There's not a third choice.

"The Defendant: How am I have to jeopardize my life . . . well then you know, I might as well be just . . . you might as well just convict me right now. You might as well as just find me guilty because, I mean, you're putting me under all this pressure here of trying to defend myself. And, Your Honor, I'm pretty sure you'd know for a fact that I didn't go to law school. So, I'm gonna have to use all the wisdom that I got to try to do the best that I could to represent myself because I'm not going with Mrs. Hutchinson if I can't see eye to eye with her, and I feel like she's not going to represent me properly. You understand? I've been through that before where I had . . . I went to trial and I was young and ignorant to the fact of a crime I didn't commit. I don't want that to happen again.

"The Court: Sir, what are we doing now? Are we going to—you know, are you going to represent yourself and select a jury, or are you going to elect to be outside of the courtroom? . . .

"The Defendant: I don't know what to do, Your Honor. I—all I want to

do is cooperate, man, but I don't want to be railroaded, man. I don't want to be railroaded, man.

"The Court: I want to see that you have a fair trial, and now is the time for trial." (Internal quotation marks omitted.) *State* v. *Bush*, supra, 156 Conn. App. 279–82.

[33] The record reveals the following colloquy on this point:

"The Court: Okay, I'm listening to you, but right now we have the jury selection issue. But by these papers you meant the fifty . . . how many pages were in the front?

"[Attorney] Hutchinson: Your Honor, the six sales, the six alleged sales—

"The Court: How many?

"[Attorney] Hutchinson: I'm going to say it's—

"The Defendant: Matter of fact you know what, Your Honor? We don't even need them. Let's just start with Mrs. Hutchinson then. I'll go with Mrs. Hutchinson.

"The Court: You'll go with Miss Hutchinson?'

"The Defendant: Yes, I will.

"The Court: Well okay, you know, I'll tell you, I think that's a—

"The Defendant: I already know, Your Honor.

"The Court: —wise decision.

"The Defendant: You know what, what am I gonna do, man? I don't wanna do this, but you know what I'm sayin', man? . . . I mean, I want to go over the stuff itself, man, and try to figure out, you know what I'm saying, because like I explained to you on many occasions, and you know what I explained to you.

"The Court: Okay. Now you want to go forward with Miss Hutchinson?

"The Defendant: Yes, yes, I'm going to go forward with Miss Hutchinson, man." (Internal quotation marks omitted.) *State* v. *Bush*, supra, 156 Conn. App. 282–83.

[34] With respect to timely requests for self-representation, there are "four instances" that support denial: "A defendant's request may be denied when a court finds that the defendant is not competent to represent himself . . . or that he has not knowingly and intelligently waived his right to the assistance of counsel. . . . A court can also deny such request because it was made for dilatory or manipulative purposes . . . or because the defendant's behavior is disruptive or obstructive." (Citations omitted.) *State* v. *Braswell*, 318 Conn. 815, 829, 123 A.3d 835 (2015).

[35] In *Flanagan*, we adopted the balancing test utilized by the Second Circuit; see *Williams* v. *Bartlett*, 44 F.3d 95, 99 n.1 (2d Cir. 1994); and held that, "when a defendant clearly and unequivocally has invoked his right to self-representation after the trial has begun, the trial court must consider: (1) the defendant's reasons for the self-representation request; (2) the quality of the defendant's counsel; and (3) the defendant's prior proclivity to substitute counsel. If, after a thorough consideration of these factors, the trial court determines, in its discretion, that the balance weighs in favor of the defendant's interest in self-representation, the court must then proceed to canvass the defendant in accordance with Practice Book § 44-3 to ensure that the defendant's choice to proceed pro se has been made in a knowing and intelligent fashion. If, on the other hand, the court determines, on the basis of those criteria, that the potential disruption of the proceedings already in progress outweighs the defendant's interest in self-representation, then the court should deny the defendant's request and need not engage in a § 44-3 canvass." *State* v. *Flanagan*, supra, 293 Conn. 433.

[36] To this end, the Ninth Circuit cases relied upon by the defendant are distinguishable insofar as they concern requests for self-representation that were timely because they were made prior to the commencement of trial. See *United States* v. *Farias*, supra, 618 F.3d 1054–55 (given lack of evidence or finding that defendant was acting to delay trial, with motion made at pretrial hearing, trial court deprived defendant of right of self-representation by requiring him to start trial immediately should he elect to represent himself because "we are certain that a single day's preparation was wholly insufficient"); *United States* v. *Royal*, supra, 43 Fed. Appx. 44–45 (improper denial of pretrial motion for self-representation not cured by subsequently allowing defendant to proceed as self-represented party on morning of trial without giving him opportunity to "adequately prepare" via grant of less than thirty day motion for continuance, when record showed no evidence of inconvenience for court or other parties); *Armant* v. *Marquez*, supra, 772 F.2d 557–58 (abuse of discretion to deny continuance because rescheduling would not have been difficult and defendant needed time to call additional witnesses, make additional motions, and review preliminary hearing tran-

script).

[37] Other cases similarly demonstrate the proper exercise of a trial judge's discretion to deny a motion for a continuance to facilitate a request for self-representation. See *People* v. *Jenkins*, supra, 22 Cal. 4th 1038–40 (trial court did not deprive defendant of due process in denying motion for continuance once it granted his midtrial request to proceed as self-represented party because it advised defendant of perils including that no additional preparation time would be granted, and defense counsel had adequate preparation time and was serving as standby counsel); accord *Barham* v. *Powell*, supra, 895 F.2d 22–23 (denial of self-represented defendant's pretrial request for fifty-six day continuance was not abuse of discretion that deprived him of right to self-representation as trial had already been delayed twice at defendant's request "because of changes in his representation," and availability of standby counsel to provide legal research materials accommodated for lack of library access while he was incarcerated awaiting trial); *State* v. *Lamar*, 205 Ariz. 431, 437–38, 72 P.3d 831 (2003) (trial court did not abuse discretion by denying pretrial denial of motion for continuance because [1] defendant "has failed to explain why he could not meaningfully exercise his right to self-representation without a continuance," [2] rescheduling murder trial, which had already been continued several times, "would have caused considerable inconvenience," [3] defendant represented familiarity with case during canvass and discharged attorneys were available to serve as standby counsel, and [4] defendant did not elect self-represented status until more than two years after entering plea of not guilty), cert. denied, 541 U.S. 940, 124 S. Ct. 1655, 158 L. Ed. 2d 362 (2004).

[38] We note that the record does not establish, and the parties disagree, as a factual matter about whether the defendant had ever personally seen the state's 900 page disclosure prior to trial and the trial court's grant of a four day review period. Specifically, the state argues that the Appellate Court's conclusion that "Thursday night, Friday, Saturday, and Sunday was an inadequate amount of time for the defendant to meaningfully review the state's disclosure" was predicated "upon the erroneous assumption that the defendant had never seen those documents during the eight months prior to trial when he was represented by counsel," particularly given that the trial court had granted a continuance four months earlier to allow Hutchinson to review the state's belated and voluminous disclosure. The defendant, however, emphasizes that his statements in the record demonstrate that he had not received any documents from Hutchinson, and that this lapse was a factor contributing to the breakdown of their relationship. The defendant also relies on Hutchinson's representation to the trial court that "whether [he represents himself] or there's an attorney, whoever is defending the case would be looking at these papers all weekend long," as demonstrating that the defendant had not seen them before. Even if we accept the defendant's reading of the record, which he contends demonstrates that he had personally never seen those documents prior to the commencement of trial, the trial court nevertheless did not abuse its discretion in denying the continuance. Given the late assertion of the defendant's right to self-representation and the fact that several jurors had already been selected, the trial court reasonably relied on Hutchinson's representations, as an officer of the court, that she had culled the portions that related specifically to the defendant for his review. This is particularly so, given that Hutchinson remained in the case as standby counsel and would have been available to advise the defendant with respect to the content of the remaining records.

————————————————